# CIRCUIT COURT OF THE UNITED STATES,

FOR THE

# DISTRICT OF VERMONT,

At Chambers, November 27, 1851.

---

HARRY BRADLEY AND OTHERS *v.* ANDREW J. RICHARDSON AND
OTHERS.

*Corporation. Relief in equity against judgment at law. Substitution of creditor. Authority of officer of corporation. Interest of such officer. Acquiescence. Liability of factor for sales on credit. Agreement by factor to make advances. Set off. Estoppel. Right of factor to apply avails of sales.*

When corporate rights and interests are affected in any way wrongfully and injuriously, these rights and interests, generally speaking, and unless some special grounds be shown, must be asserted and defended, both at law and in equity, in the corporate name.

It is not sufficient for a debtor, or for those who are entitled to assert his rights, in order to induce a court of equity to relieve against a judgment at law, to show that the debtor was wrongfully deprived of an opportunity of making defence in the suit at law, unless a defence, apparently, would have been available. To entitle them to the interposition of a court of equity in their behalf, it must appear, that the judgment is unjust and inequitable and ought not to be enforced.

Where property of a debtor, which is subject to an attachment in a suit pending at law, is sold to one to hold in trust for certain creditors of the debtor, and a judgment is rendered in the suit at law, and the creditors, for whose benefit the purchase was made, institute proceedings in equity to be relieved against the judgment so obtained, alleging that it was unduly obtained, and for too large an amount, the court will not inquire merely whether the judgment was just and equitable, as between the parties to it, but whether it includes claims, or demands, not covered by the action, or not due and payable at the commencement of the action, or which, by a proper application of payments, or credits, will appear to have been paid and satisfied, and were not therefore existing legal claims; and unless the judgment appears to be wrong in some of these particulars, and consequently to have been rendered for more than the property ought to be charged with, the orators will have no ground of complaint, whatever may have been the manner, in which the judgment was obtained.

Bradley et al. *v.* Richardson et al.

R., B. & Co., a copartnership, acted, by mutual agreement, as the selling agents of the Burlington Mill Co., a manufacturing corporation. The copartnership of R., B. & Co. was dissolved, and a new firm constituted, under the same style, and consisting in part of the same members. The new firm assumed and contined the businesss of the old firm, acting as the selling agents of the corporation, under the same agreement which existed with the old firm. The corporation, by its treasurer, requested the new firm to pay and adjust the balance due from the corporation to the old firm and charge it in their account to the corporation; and they did adjust it accordingly, and the old firm credited the corporation with the amount of the balance, as received of the new firm, and rendered their account to the corporation, balanced by the credit in full. And it was held, that it must be inferred, that this balance was discharged by the payment of money, or what was equivalent thereto, and that the corporation thereby became debtors to the new firm for the amount, which might be recovered by them in an action for money had and received, or for money paid and advanced.

And the treasurer not being merely the keeper of the money of the corporation, but empowered by the directors to borrow money in the name and for the use of the corporation, and having a general authority given him, by the by-laws, to pay the debts of the corporation, it was held, that he had sufficient authority to give the assent of the corporation to the transaction, by which the balance due to the old firm was thus paid.

And it was also held, that it could not be objected against the validity of the transaction, that the treasurer was a member both of the old and of the new firm,—that fact being fully known to the corporation.

And an account having been rendered to the corporation, stating the balance, the payment of it, and by whom it was paid, and no objection having been made at the time, or afterwards, until a suit was commenced against the corporation by the new firm, to recover the amount due to them, it was held, that the transaction must be deemed acquiesced in by the corporation.

The undertaking of a factor is merely to answer for the solvency of the buyers of the goods, or, rather, to guarantee to the principal the payment of the debts due from the buyers. He becomes liable to pay to the principal the amount of the purchase money, if the buyers fail to pay it, when it becomes due. And his undertaking is not collateral, within the statute of frauds, but is an original and absolute agreement, that the prices, for which the goods are sold, or the debts created by the sales of the goods, shall be paid to the principal, when the credit given on the sales shall have expired.

If the factor have agreed, that he will advance to a certain amount upon the goods consigned to him, to that extent his advances may be treated as payment in advance of so much towards the goods, and so far the one may be set off

XXIII.     91

against the other. But all moneys advanced on account, beyond the amount agreed to be advanced upon the goods, will constitute a present legal debt, for which he will have a present legal right of action.

And if the principal procure and have the benefit of the advances, he is thereby precluded from objecting to them, as not answering the agreement, whatever may have been the form, in which they are made.

And if the factor commence a suit at law against the principal, to recover the unpaid balance due to him for his actual advances, having previously made sales of goods upon a credit not yet expired, and being at the same time liable upon acceptances and bills for the principal not yet matured, he is entitled to have the avails of the sales, as they become due, applied in satisfaction of the additional advances which he is compelled to make upon such bills and acceptances, as they become due, and cannot be required to apply such avails in satisfaction of his present legal claims existing at the commencement of his suit.

This was a motion for an injunction, predicated upon a bill filed by Bradley and others against Richardson and others, to stay execution of two judgments, amounting together to the sum of $51,992,-04, recovered by Richardson and others, at the October term of the Circuit Court, 1851, against the Burlington Mill Company, a corporation established, under an act of the legislature of Vermont, for the manufacture and sale of woolen goods. The facts will sufficiently appear from the opinion given on the decision of the motion.

*W. W. Peck* and *D. A. Smalley* for plaintiffs.

*L. B. Peck* for defendants.

Prentiss, J. I have taken time to read the bill and papers filed in this case, which are uncommonly voluminous and contain a great variety of statements and facts, because I thought it unfit, and was unwilling, whatever might be the inclination of my mind at the hearing, to decide a matter of so much importance to the parties, without first examining carefully every paper connected with it, as well as the authorities referred to by the counsel in the argument.

The bill may be considered in a three fold aspect;—as presenting a right in the plaintiffs to relief, first, as *stockholders* in the Burlington mill company; secondly, as *creditors* of the mill company;

Bradley et al. *v.* Richardson et al.

and, thirdly, as *cestui que trusts* under the purchase of the property attached in the suits at law, made by Hill as their trustee, subsequent and subject to the attachments, he having deceased, and there being no personal representative competent to sue here in his right.

As stockholders simply, there would be much difficulty, on the statements made in the bill, in the plaintiffs' maintaining it. As such, they are not personally or individually responsible for the judgments recovered against the mill company; nor have they in that character any interest whatever in the property which was attached and is liable to be taken to satisfy the judgments. Where the corporate rights and interest are affected in any way wrongfully and injuriously, these rights and interests, generally speaking, and unless some special ground be shown, must be asserted and defended, both at law and in equity, in the corporate name. Now, the bill does not state any fraud, or collusion with the judgment creditors, on the part of the mill company; but, on the contrary, it alleges, that the judgments were obtained without the consent and against the will of the company, and were a fraud upon the company. In this aspect of the case, it would seem, that the company, in its corporate name, would be the proper party to seek relief against the judgments.

On the general ground of being creditors of the mill company, without some special interest, it would be equally difficult for the plaintiffs to maintain their claim to relief. What right has one creditor to interfere in a suit, or indeed in any transaction, between his debtor and another creditor, unless he have some specific interest in property which is to be affected thereby? In the case of a fraudulent judgment, creating a lien on property, or a fraudulent conveyance of property, the party seeking relief against either must show an interest in the particular property, by levy of execution, purchase, or otherwise.

But whatever rights the plaintiffs may be supposed to possess as stockholders, or creditors, it is not sufficient for them, nor would it be for the mill company, to show that the latter was wrongfully deprived of an opportunity of making defence in the suits at law, unless a defence, apparently, would have been available. To entitle them to the interposition of a court of equity in their behalf, it must appear, that the judgments are unjust and inequitable, and

ought not to be enforced. If the proceedings of the stockholders and directors at Boston, dismissing the attorneys from the suits and consenting to judgments being rendered, were irregular and invalid, as is alleged, on account of the meetings being held out of this state, the attorneys, instead of withdrawing from the suits and suffering judgments to pass *sub silentio*, should have objected to the proceedings at the time, and submitted the question as to their validity and binding force to the consideration and decision of the court.

But the judgments, it is to be observed, were not obtained, certainly not altogether so, without a hearing and without a defence. A hearing had been had upon the merits before a tribunal, whose opinion, considering how the tribunal was constituted, ought to command at least as much respect, to say no more, as that of a jury. The actions, by agreement of the parties and order of court, had been submitted to the determination of referees mutually chosen by the parties. The referees had heard the parties, made an award, and reported the award to the court, stating the facts and grounds upon which it was made. Exceptions were filed to the report, raising certain questions of law on the facts stated; but no exception was taken, or is now taken, on account of partiality or misbehavior in the referees. It was, therefore, only questions to points of law thus raised, that could be heard or re-examined by the court. Beyond these questions, no hearing was to be had, nor is it now urged that any could or should have been had. All else was settled; for of the facts the referees were the exclusive judges.

If the referees decided these questions rightly, and committed no mistake in point of law, the judgments are right, and there can surely be no reason in equity why the plaintiffs, in their general character of stockholders and creditors, and upon that general ground alone, should be allowed to disturb the judgments. In the case of *Nason et al.* v. *Smalley et al.*, 8 Vt. 118, the object of which was to enjoin a judgment at law alleged to have been fraudulently obtained, Phelps, J., said:—"Although the judgment may have been obtained in such a manner, that it ought not, in itself considered, to bind the complainants, yet it would be idle to interfere, if the debt thus in fact established be just and equitable, or if the party must be left at liberty to prosecute anew, and a court of law would be compelled hereafter to render a like judgment." This is good

sense and sound doctrine, well expressed, and nothing can be added either to its force or significancy.

But it is in the third aspect of the case, if in any—as *cestui que trust* under the purchase made by Hill of the property attached, and as interested in the purchase as creditors in the manner stated in the bill—that the plaintiffs are entitled to come into a court of equity and ask relief against the judgments. This relief they will be entitled to, if the case calls for relief, whether the judgments were rendered with or without the consent of the mill company; and in this view, so far at least as concerns the question of title to relief, the manner in which the judgments were obtained, farther than there being in fact no hearing in court, or the validity or invalidity of the proceedings of the stockholders and directors in Boston in relation thereto, is unimportant. I may observe, however, that whatever fraud is charged upon the directors, either in act or in motive, on account of those proceedings, is positively and fully denied by their affidavits, leaving no ground, if any existed before such denial, for the imputation to them of intentional wrong.

The bill states that the purchase by Hill was made subject to the attachment, and in trust for the plaintiffs and others, creditors of the mill company, which is alleged to be insolvent, in order to secure or satisfy them, as far as might be, for notes, called three fifths notes, executed by them to raise money for the use of the company. It is stated that the *cestui que trusts* were to share in the purchase in proportion to the amount of notes so by them respectively executed; that the whole amount of notes executed was about $120,000; and that the amount executed by the plaintiffs was about $23,000, giving them therefore an interest in the purchase equal to about one fifth part. It appears that most of the other *cestui que trusts* have given their assent to the judgments, and are willing that they should be satisfied out of the property. Under such circumstances, the other *cestui que trusts* being content, it would seem that the claim of the plaintiffs to relief, if they have any claim, would be limited, and the measure and mode of relief adjusted and regulated, by the amount of injury, if any, wrongfully resulting from the judgments to their particular personal interest in the property.

As the purchase by Hill comprehended the whole property attached, and the whole interest in it, except what was a legal subsist-

ing charge upon it by virtue of the attachments, the inquiry is, not. merely whether the judgments are just and equitable as between the parties to them, but whether they include claims or demands not covered by the actions, not due and payable at the commencement of the actions, or which by a proper application of payments or credits will appear to have been paid and satisfied, and were not therefore existing legal claims. This opens an examination into the merits of the judgments ; and unless they shall appear to be wrong in some of these particulars, and consequently are for more than the property ought to be charged with, the plaintiffs have no ground of complaint, whatever may have been the manner in which the judg-ments were obtained.

The actions were commenced the 21st, and the attachments made the 22nd of May, 1849; and the purchase by Hill, in trust for the plaintiffs and others, was made June 13, 1850. The actions con-tained counts on several promissory notes, and counts for money had and received, money laid out and expended, and money lent and advanced.

The actions, as we have already seen, and I may add, nothing but the actions, by mutual consent of the parties and order of court, were in proper and regular form submitted to a reference; and upon the report made by the referees, stating specially the grounds of their award, or rather the claims and facts in the case, the judgments complained of were rendered. The report is set forth at length in the plaintiff's bill, and the statement of facts in it is neither denied, impugned, or questioned. Being made a part of the bill for the purpose of presenting the merits of the controversy between the par-ties in the suits at law, and being treated by the bill as the basis upon which the objections to the judgments rest, we must look into the report to see whether the judgments subject the property attached to a greater charge than it was legally and properly liable to under the attachments. The bill, aside from what is alleged as to the man-ner of obtaining the judgments, which seems not to be essential to the purpose of the bill, beyond showing that they were rendered without any actual hearing or consideration by the court, puts the case upon this ground, narrrowing down the merits to the particular questions arising upon the report.

The questions raised as to the binding effect of the promissory

Bradley et al. *v.* Richardson et al.

notes upon the mill company, on account of the form in which they were executed, and the purpose for which two of them were made, it is unnecessary to consider; because all the claims that were allowed, if allowable at all, were admissible under the general counts in the actions.

It appears from the report, that the dealings between the judgment creditors and the mill company originated in an arrangement, under which the former were to receive and sell, on an allowance of commissions and other charges, the manufactured goods of the latter, guaranteeing the sales of the goods, and advancing thereon in cash and acceptances, and notes as used in the course of dealing, to the amount of three fourths of their value. It also appears, that the agreement on the part of the judgment creditors was at all times fully performed; and that at the commencement of their actions they had paid for the avails of all the sales of goods, which had matured up to that time, and had also advanced, in cash and the payment of matured notes and acceptances, the sum of $149,062, over and above all matured sales and moneys received,—the unmatured notes and acceptances being to a still much larger amount, and greatly exceeding the unmatured sales, as will be hereafter more fully seen.

Such appears to have been the state of the account between the parties at the commencement of the suits, as reported by the referees. According to their finding, there was a balance then due the judgment creditors for over advances of $149,062 ; and such being the report, that sum must be taken to have been legally and properly recoverable by them at that time in the suits, unless it shall appear that claims were allowed, which ought not to have been allowed, or payments or credits disallowed which ought to have been allowed.

We are not called upon to go into an examination of all the items in the account between the parties, but only of such, as we have before remarked, as raised some question of law which appears to have been presented by the report for the consideration and opinion of the court. The matters of fact upon which the questions arise, appear to be fully and distinctly stated; and from these and other details in the report, I am free to say, that the proceedings of the referees, after a careful and somewhat critical examination of them, appear to me, as far as I can see, to evince no other purpose than that of a just performance of duty.

It appears that items in the account of the judgment creditors, very considerable both in number and amount, being objected to, were disallowed; and that several claims set up by the mill company, though objected to, were allowed. The only items of any importance in the account of the judgment creditors, which were allowed against objections made to them, except one which deserves a distinct consideration and will be presently mentioned, were for commissions and charges on goods sold, money paid for the salary of the mill company's treasurer, and money paid at the request of the company for extra interest in raising money for its use to enable it to meet and pay its accommodation drafts. These claims, on the facts stated in the report, do not appear to have been improperly allowed; and as to the amount which ought to have been allowed upon them, that was a matter entirely within the province of the referees, and not the subject of re-examination, unless upon the ground of misconduct or gross partiality, at the instance of the plaintiffs or any one else.

We come, then, to the item just alluded to, of 46,912, charged by the judgment creditors, who compose the present firm of Richardson, Burrage & Co., for money paid by them in discharge of a balance due from the mill company to the old firm of Richardson, Burrage & Co. The two firms are distinguished in this way. The old firm consists of three partners; the new firm consists of four, two of the old partners, and two new ones. The old firm was a large stockholder in the mill company, owning, it is stated, one third of the whole stock, and acted during its existence, under a mutual agreement, as the selling agent of the mill company. The new firm assumed and continued the business of the old firm, acting as selling agent of the mill company under the same agreement, in place of, and under the same name and style borne by the old firm. The facts in relation to the item in question, as stated in the report of the referees, are these. The mill company, by its treasurer, requested the new firm, in other words the judgment creditors, to pay and adjust the balance due the old firm, and charge it in their account to the mill company. They did adjust it accordingly, and the old firm credited the mill company with the amount of the balance as received of the judgment creditors, and rendered their account to the mill company balanced by the credit in full.

On the facts thus stated, the transaction had the assent of all the three parties, and by it the mill company was discharged from its liability to the old firm, so that the latter had no longer any right of action against it; and can there be any doubt that the mill company became a debtor to the judgment creditors for the amount, or that the amount might be recovered by them in an action for money had and received or money paid and advanced? If the transaction were to be considered rather as a transfer or assignment of the demand, than as extinguishing the old debt and creating a new one, and the consideration paid had been something other than money, it would seem to bring the question as to the form of action, the demand being for money advanced, within the principle adopted in *Wilson* v. *Coupland,* 5 Barn. & Ald. 228, recognized and confirmed in *Wharton* v. *Walker,* 4 Barn & Cres. 163. But on the facts stated, it must be taken that the original debt was satisfied by actual payment, and therefore extinguished; and from the acknowledgment of payment in general terms, it must be inferred that it was dicharged by the payment of money or what was equivalent thereto.

It is said, that the treasurer had no authority to give the assent of the mill company to any such transaction, or to bind it in any such way. But the treasurer was not merely and simply the keeper of the moneys of the company, according to the ordinary definition of such an office. He was its fiscal agent for other purposes. He was empowered by the directors to borrow money in the name and for the use of the company; and was not the transaction in question, in substance and effect, if not in form, a borrowing of money for the use of the company? Besides, in addition to other duties, such as purchasing the materials to be used in manufacturing, directing the kinds of goods to be manufactured, and receiving all moneys due from agents and others, he had a general authority given him by the by-laws to pay the debts of the company; and could he not pay a debt, or enter into an arrangement for the payment of a debt, in the manner in which this was done? It appears to me that in regard to this no serious doubt can be entertained.

It is also said, that the treasurer was a partner, and therefore interested, both in the old and new firm. So he was, and was so known to be by the mill company not only when it appointed him treasurer and when it afterwards refused to accept his resignation of the office,

XXIII.        92

but also when it made the firms its selling agents.  With this knowl-
edge, the company could not be allowed to object, and if so no one
else can object, that his connection with the firms disqualified him to
perform the proper functions of treasurer in this or any other matter
in which they might have an interest growing out of the agency.  If
he had not so acted, the agency could not have been executed, but
must have been discontinued, and the purpose of the contracting
parties have been defeated.  But there was nothing in this par-
ticular transaction that was wrong in itself considered, or at all
prejudicial to the interests of the mill company.  It was simply a
transfer of indebtedness from the old to the new firm, making the
latter, instead of the former, whose place and business it had suc-
ceeded to in the agency, the creditor of the company.

But it is also to be remembered, as a fact not without its effect
upon the question, that an account was rendered, stating the bal-
ance, the payment of it, and by whom the payment was made.  The
account was rendered the 30th of September, 1848, and no objec-
tion being made to the account as stated and balanced, the transac-
tion may be deemed to have been acquiesced in.  This is the rule
of law in matters of account of a commercial nature, if not in mat-
ters of account in general; and there is no reason why it should not
apply to a private corporate body, engaged in trade, and conducting
its affairs through the instrumentality of officers and agents, as well
as to individual natural persons, carrying on similar business, and
transacting it either in person or through the agency of others.  It
may be added, that the equity of the claim is very apparent.  The
referees examined the account of the old firm, and found the balance
which was paid it to have been justly due.

It is farther insisted by the plaintiffs, that the judgment creditors
had, previous to the commencement of their suits, sold on credit a
large amount of goods consigned to them by the mill company, and
that the amount of these sales, although the credit given upon them
had not then expired, should have been allowed in payment or satis-
faction of the claims composing the balance found then due.

It appears that sales had been so made to the amount of $148,-
695; that the sales matured at different times from the 19th of July,
1849, to the 18th of January, 1850; and that the sales were cred-
ited in account, stating the times when due.  It also appears, that

Bradley et al. *v.* Richardson *et al.*

the judgment creditors had, previous to the commencement of their suits, given notes and accepted drafts for the mill company to the amount of $198,824, payable at different times from the 23d of May to the 11th of October 1849, and that the notes and drafts, although not matured, were charged in account, mentioning, as in the case of the sales, the times of their maturity. It is evident, that this mode of keeping the accounts, on the one hand crediting sales before matured, and on the other charging notes and acceptances before due and payable, or before paid, was merely for the sake of convenience and accuracy, and to present the transactions as they occurred in an intelligible form, and could not accelerate or in any way alter the legal liability of either party.

The judgment creditors were factors, selling goods for the mill company on commission; and it becomes a material question, whether a factor, in the case of a sale by him of goods on a credit, is, as the plaintiffs contend, instantly or immediately liable to the principal for the amount of the sales; or, in other words, whether the principal has any legal right of action against the factor until the credit has expired. Whatever doubt may have once existed on the subject, I think the question is now settled, by judicial decisions and the opinions of eminent commentators on the law, both in England and in this country. It is established, that the undertaking of the factor is merely to answer for the *solvency* of the buyers of the goods, or, rather, to guarantee to the principal the payment of the *debts* due from the buyers. He becomes liable to pay to the principal the amount of the purchase money, if the buyers fail to pay it when it becomes due. This is the effect and whole extent of his engagement. The doctrine is so laid down in all the adjudged cases, with few exception, and is recognized as the true doctrine by Chancellor Kent in his commentaries, and by Judge Story in his treatise on agency. And I think it necessarily must be so, if the factor has authority to sell on credit, as he indisputably has, and if the principal may maintain an action against the buyers of the goods, which has been often adjudged, and is no where denied.

Some confusion has arisen on this subject from the decisions on the question, whether the undertaking of a factor is a contract within the statute of frauds, and so must be in writing. The better opinion is, that it need not be in writing; that, though a guarantee, it is not

a *collateral* engagement, but an *original* and *absolute* one, that the prices for which the goods are sold, or the debts created by the sales of the goods, shall be paid to the principal when the credit given on the sales shall have expired. Thus, in summining up the law on the subject in a note in .1 Amer. Lead. Cas. 659, 660, it is said, that the contract is " a *direct* and *absolute* engagement by the factor, that the debts for which the goods are sold shall be paid *at the time they are due*, or, in other words, that they shall be *cash* in the principal's account *at the time they are due.*"

The plaintiffs insist that the *lex loci* must govern the decision of this question ; and to show the law of the place where the contract was made and executed, they cited the case of *Swan* v. *Nesmith*, 7 Pick. 220. In that case, the question was, whether the undertaking of the factor was within the statute of frauds. The court held the liability to be original, and that a guarantee of that nature need not be in writing. But they expressly admitted, that where the goods are sold upon credit, the liability of the factor is not fixed until the time of payment arrives. The case, therefore, so far as it has any application to the present question, is an authority against, rather than for the plaintiffs. But if it was otherwise, it could not be allowed to prevail against the general, and what I conceive to be the established rule of commercial law. In *Swift* v. *Tyson*, 16 Pet. 1, it is laid down, as I have had occasion once before in an important matter to show, that the true interpretation and effect of contracts and other instruments of a commercial nature, in suits in the courts of the United States, are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence.

From what has been said, it follows, that the judgment creditors, at the time of the commencement of their suits, were not chargeable for the sales of goods made by them before that time, but due and payable at different times afterwards, beyond the amount, at any rate, of what they were bound by their agreement to advance upon them. To that extent the advances might be treated as payment in advance of so much towards the goods, and so far the one might be set off against the other. But all moneys advanced on account, beyond the amount agreed to be advanced upon the goods, would constitute a present legal debt for which there would be a present legal

Bradley et al. v. Richardson et al.

right of action. We have already seen the extent of the difference existing in favor of the judgment creditors at the commencement of the suits, between the amount of sales then matured and the amount of moneys then actually advanced, and also between the aggregate of unmatured sales and the aggregate of unmatured notes and acceptances. It does not appear what portion of the advances stipulated to be made was to be in ready money, and what portion in notes and acceptances on time; but it is to be inferred from the report, that the advances were made, both in point of form and time, according to the calls of the mill company, and in such manner as suited its wants and wishes. If the company procured and had the benefit of the advances, it is thereby precluded from objecting to them as not answering the agreement, whatever may have been the form in which they were made. Considering the unmatured notes and acceptances, therefore, as satisfying the agreement as to advances upon the unmatured sales, the judgment creditors had, at the commencement of their suits, arising from over advances, an actual unpaid and unsatisfied balance due them from the mill company of $149,062, which they had a legal right to sue for and secure by attachment of the property of the company. Indeed, upon any adjustment, or any appropriation of the advances to the sales, not directly at variance with the agreement and the practical construction put upon it by the acts of the parties, the balance at that time would greatly exceed what was ultimately recovered in the suits.

But it is said, that when the sales in question matured, if not before, especially when the money was received upon them, they operated as payment of so much of the claims for which the suits were brought, and should be so treated. Whether this be so or not, will be readily seen by recurring to the facts. The money on these sales became due at different times from the 19th of July, 1849, to the 18th of January, 1850. On the credit of these sales, the judgment creditors had, previous to the commencement of their suits, given notes and accepted drafts for the mill company, not only amounting to a sum much larger than the amount of the sales, but payable at different times from the 23d of May to the 11th of October, 1849, much earlier than the money on the sales would become due. For these notes and acceptances, the judgment creditors had a lien on the goods, and of course on their proceeds. Was it not, therefore,

Bradley et al. *v.* Richardson et al.

legal, as well as just and equitable, that the money arising from the sales should be applied, as it became due, in satisfaction of the advances the judgment creditors were obliged to make in payment of the notes and acceptances as they fell due? The application was so made; and I have no doubt that it was in accordance both with the usage in such cases and with law.

The referees, it appears, allowed all payments made by the mill company, arising from sales or otherwise, down to February 15th, 1851, when the accounts between the parties closed, deducting from the sales, advances, commissions, and other proper charges upon them; and it was by the allowance of such payments, and the withdrawal by the judgment creditors of their claim for three fifths notes, that the balance due them at the commencement of their suits was reduced down to the sum recovered by the judgments. In this way, the balance of the subsequent account between the parties was ascertained and allowed, not to the prejudice, but to the benefit of the plaintiffs.

I have thus noticed in a summary way all the material facts and points connected with the merits of the case; and upon consideration of the whole, I am of opinion, that the plaintiffs have no claim in equity to have the property relieved, either wholly or partially, from the lien created by the attachments, or from the enforcement of the lien by execution of the judgments, and, consequently, that the injunction moved for ought not to be granted.