The New York and New Haven Railroad Company *v.*
Robert Schuyler, Morris Ketchum, Edward Bement,.
*et al.*

Where a case is sent back by this court for a new trial, indicating the proper
disposition to be made of it by the court of original jurisdiction, the practice
requires a new judgment by that court, and a new, formal appeal to the
General Term, before an appeal lies to this court.

Any party, whose rights are affected by the last judgment of the Special Term,
may appeal therefrom within the time prescribed by statute; and such appeal
will bring up any question properly arising in the course of the trial.

Spurious stock, attempted to be created in excess of the legal capital of an
incorporated company, forms no part of the capital stock, and is void.

A corporation is liable to the same extent, and under the same circumstances,
as a natural person, for the consequences of its wrongful acts or omissions.

A corporation is responsible for the acts, and for the negligence, of its agents,
while engaged in the business of their agency, to the same extent, and under
the same circumstances, as natural persons.

The doctrine of implied agency arising out of negligence, has its true basis in
the principle of *estoppel in pais;* and is based upon the injustice of allowing
a party to be the author of his own misfortune, and then to charge the
consequences upon others; and it implies an act in itself invalid, and a person
forbidden, for equitable reasons, to set up its invalidity.

Where the act of the agent can be charged home upon the corporation, then the
*bona fide* holder of any certificate issued by the transfer agent has a primary
and direct claim upon the company, either to be admitted as a corporator, or
to be compensated for the fraud practiced upon him.

To entitle the aggrieved party to sue in such case, no privity is necessary,
except such as is created by the unlawful act, and the consequential injury.

Where the authority of an agent depends upon some fact outside the terms of
his power, and which, from its nature, rests particularly within his knowledge,
the principal is bound by the representations of the agent, although false, as
to the existence of such fact.

Where the stock of a corporation is, by the terms of its charter or by-laws,
transferable only on its books, the purchaser receiving a certificate with
power of attorney, &c., gets the entire interest of the seller *with* all his rights.

Such purchaser, neglecting to have the transfer made on the books of the
corporation until after such stock is transferred to a *bona fide* holder without
notice, loses his right to demand and have the transfer thereof made to him.

But the corporation would be liable to the holder of such certificate, for permit-
ting the stock to which he was entitled to be transferred to another, &c.,
because they had constructive notice of these outstanding certificates.

All duties imposed by law upon a corporation, raise an implied promise of
performance, &c.

This is an action in the nature of a suit in equity, against Robert Schuyler and several hundred other defendants. The complaint was sustained by this court on demurrer, as will appear by reference to the reported case in 17 N. Y., 592. The object of the complaint was to have a large number of alleged false and fraudulent certificates and transfers of pretended stock of the company, made by Schuyler, and charged to be held by the defendants, adjudged spurious and void; and to compel the certificates to be brought into court and canceled; and to enjoin the several defendants from further prosecuting actions then pending, and from bringing suits against the company to enforce such certificates and transfers, or to recover damages for any reasons connected therewith. After alleging the various facts upon which the plaintiffs claimed the relief, and setting forth the several suits then pending, the complaint proceeds to allege: "That the plaintiffs are informed and believe that it is the intention of other holders of the said false and fraudulent transfers of stock and certificates of stock to commence other actions against the plaintiffs, for refusing to transfer the said stock so purporting to be represented by the said false and fraudulent certificates as genuine stock; that said actions will be very numerous, and, as the plaintiffs believe, exceeding one hundred, and will subject the plaintiffs, and the parties to those actions respectively, to great and unnecessary expense, trouble and litigation; and that such actions, if commenced, and especially if followed up by attachments, will greatly injure and damage the interests of the plaintiffs, and the interests of the genuine stockholders of the company and its creditors, and other persons interested in its stock, effects and earnings; that the plaintiffs are advised and *believe that the rights of all the said holders of the said false and fraudulent certificates, and of the said fraudulent transfers, may be determined and adjusted in one action without prejudice to the rights of any of them, and so as greatly to promote the convenience and advance the interests of all persons interested in said company, whether as holders of the genuine stock or of the illegal and fraudulent certificates and transfers.*"

\*   \*   \*   \*    That the said company "are not authorized or
empowered, as they are advised and believe, to acknowledge
or recognize any of the said false and fraudulent certificates
of stock, or any of the said transfers of stock, or as constitut-
ing any claim against the company, without an adjudication
by some sort of competent jurisdiction requiring them so to
do; and that, under the circumstances, they cannot make
any dividends to genuine stockholders, nor can they with
safety or accuracy determine who are entitled to vote at the
elections for directors of said company; nor can they open
the transfer books of said company, as they are desirous of
doing; *and that this action is commenced for the purpose
of impleading all the said holders and claimants under the
said illegal and fraudulent certificates and transfers, in
order that the duties and obligations of the plaintiffs and
the rights and claims of the holders of said certificates may
be settled in one suit, and to the end that a multiplicity of
actions, and the delay, expense and litigation attendant
thereon, may be avoided.*"

The complaint concludes with a prayer for judgment, to
the effect that the alleged false and fraudulent certificates
and transfers may be adjudged illegal and void, and be can-
celed, as not representing any stock in the company, and as
not constituting any claim or obligation upon the company;
and that the holders thereof should be enjoined and restrained
from bringing any suit, action or *bill in equity against the
plaintiffs for or on account of the said certificates, or any of
them, or of the stock purported to be represented thereby, or
of the act of the said Robert Schuyler, in creating or issuing
the same, and that the defendants who had commenced suits,
be enjoined from prosecuting the same, and that those several
actions be consolidated and tried with this action,* &c.

A large number of the defendants answered, setting forth
various facts and grounds upon which they claimed that the
plaintiffs were not entitled to the relief sought, and that
the certificates or transfers respectively held by them were,
or ought to be, treated as valid and binding on the company;
or damages awarded to them for injuries sustained by the

alleged frauds of Schuyler, and many asking for relief by way of judgments for damages against the company.

The case was tried at Special Term, before the Hon. Daniel P. Ingraham, and occupied several months in the trial. The court found various facts (hereinafter more particularly stated), upon which he adjudged that the plaintiffs were entitled to the relief sought by their complaint, as to most of the defendants, and ordered judgment accordingly. He also found facts in respect to a large number of the defendants, upon which he decided that the plaintiffs were liable to them respectively for the damages sustained in consequence of their certificates or transfers turning out to be false and fraudulent, and were entitled separately to maintain actions against the plaintiffs for such damages, but that such damages could not be appropriately, under the pleadings in the case, adjudged to them in this action.

From the judgment entered in November, 1860, as of September 18, 1860, on the decision of the court, the plaintiffs appealed to the General Term from all that portion relating to the rights of the defendants to recover damages for the injuries to them and to maintain actions against the plaintiffs therefor; and some of the defendants appealed from so much of the decision as adjudged their certificates and transfers invalid, and annulled the same; and some from such decision and from the decision that relief by cross-judgments for damages could not be awarded in this suit.

On these appeals the General Term of the first district affirmed the judgment (with some modifications as to a few of the parties not now important to refer to) and decided, in substance, that upon the facts found by the Special Term, as to the several defendants, it was the duty of the court to have proceeded and assessed the amount of their damages respectively, and awarded judgments in this action against the plaintiffs therefor, and they ordered the case to be sent back to the Special Term for that purpose, and directed that court to proceed and assess such damages in favor of the said several defendants who should establish the amounts of their respective claims, and give judgment therefor so that final

judgments might be entered in the action, both for and against the plaintiffs and the several defendants entitled thereto. Thereupon the Special Term, before the same judge, proceeded to make the said assessments; and upon the further proofs and allegations of the parties, as well as upon the proofs and findings before given and found in the case, he found further facts touching the amount of damages, &c., upon which judgments were ordered in favor of said defendants respectively, to be entered as part of the original judgment and as an amendment thereof. The plaintiffs took exceptions to the proceedings to assess in respect to every defendant in whose favor an assessment was made, and numerous exceptions to the judgments as ordered and entered.

The last or amended judgment was entered June 30, 1864, and from this judgment the plaintiffs again appealed to the General Term, where the same was affirmed; and from such affirmance the plaintiffs appeal to this court.

Separate appeals are also brought by the defendants, Jacob Surget, Morris Ketchum and Edward Bement, survivors, &c., Henry Chauncey, and Emily, his wife, Clara P. Alsop and Cornelius Vanderbilt.

The appeals of Surget and Ketchum and Bement are from orders of the General Term dismissing their respective appeals; but it is stipulated by the parties, in substance, that in case this court shall be of opinion that the General Term should have entertained their appeals, this court shall be at liberty to consider their cases on the merits, as though judgments had been given upon them by the General Term.

The defendant Surget did not appeal from the judgment entered on the decision of the Special Term in 1860. Damages were assessed in his favor after the case was ordered back for that purpose, and from the amended judgment entered in June, 1864, he appealed to the General Term, claiming the right to review the various questions affecting him, both in the original and amended judgments.

Ketchum and Bement, survivors of the firm of Ketchum, Rogers & Bement, were found to be holders and owners of certificates for 740 shares, which were adjudged to be spurious.

It was also found that Morris Ketchum, one of the firm, was, during all the period in which Schuyler was perpetrating his frauds, one of the directors of the company; and it was held that the firm were not entitled to damages. They did not appeal from the judgment entered in 1860, but after the amended judgment was entered they appealed, claiming, in effect, to review the decision touching the validity of their stock and their right to recover for the injuries sustained by the frauds.

The General Term dismissed these appeals on the ground that they were taken too late. The other defendants who now appeal were also appellants from the original judgment; they came in and had their damages assessed, and have judgments therefor in the amended judgment; they appealed from the latter, and claim, in substance, to have reviewed the questions as to the validity of their stock and their title to be recognized by the company as stockholders, in case their right to recover the damages assessed to them shall be adjudicated against them.

The particular facts of individual cases, or classes of cases, are stated so far as necessary in the course of the opinion. The general facts as found by the court on the trial, as they appear from the pleadings and case, are, in substance, as follows:

That the plaintiffs were duly incorporated by the legislature of the State of Connecticut in 1844; and by an act of the legislature of this State, passed in 1846, were authorized to extend their road into this State, and clothed with necessary powers for conducting its business in this State; that the act of incorporation provided that the capital stock of the company should be two millions of dollars, with the privilege of increasing the same to three millions, to be divided into shares of one hundred dollars each, which shares should be deemed personal property and be transferred in such manner and in such places as the by-laws of said company should direct; and that the directors should have full power to make and prescribe such by-laws, rules and regulations, as they should deem needful and proper, touching the disposition and management of the stock, property, estate and effects of the

said company, the transfer of the shares, the duties and conduct of their officers and servants, the election and meetings of the directors, and all matters whatsoever which might appertain to the concerns of said company.

That the original corporators failed to obtain subscriptions for stock sufficient to organize the company till 1846. That on the 19th of May, 1846, a board of directors was elected, who organized their body on the same day by electing Robert Schuyler president, which office he continued to hold till his resignation thereof July 4, 1854. That on the 9th of July, 1846, the board of directors established, by certain by-laws adopted by them, a system concerning the transfer of stock of the company and the issuing of certificates therefor, according to which stocks *were transferable only on the books of the company* by the shareholder or his attorney duly appointed, and on the surrender of the certificate held by him when any certificate had been issued. The same by-laws prescribed the form of the transfer, as follows:

NEW YORK AND NEW HAVEN RAILROAD COMPANY.

No. 10,002.

Capital $3,000,000.                    Shares $100 each.

New York Office.

For value received ........ hereby assign and transfer unto ........ all right, title and interest in ........ shares in the capital stock of the New York and New Haven Railroad Company.

NEW YORK, ........, 18..

And transfer books were provided for the use of the agents, in which transfers of this form were printed in blank; and the by-laws also directed that a form of stock certificate should be adopted; and one was adopted and invariably used, as averred by the complaint, for the purpose of facilitating transfers of stock by the holders thereof, with a blank assignment and power of attorney printed upon the back of it, as follows:

New York and New Haven Railroad Company.
No. 5,294.

Capital $3,000,000.                    Shares $100 each.
New York Office.

Be it known, that ........ entitled to ........ shares of the capital stock of the New York and New Haven Railroad Company, transferable on the books of the company, at its office, in the city of New York, by the said ........ or .... attorney, on the surrender of this certificate.

New York, ........., 18..

................., *Transfer Agent.*

Know all men by these presents, that ...... for value received, ha.. bargained, sold, assigned and transferred, and by these presents do bargain, sell, assign and transfer unto ........ of ........ ........ shares in the capital stock of the New York and New Haven Railroad Company, standing in ........ name on the books of the said company, and transferable only at its office in the city of New York. And .... do hereby constitute and appoint ........ true and lawful attorney irrevocable, for .... and in .... name and stead, but to ...., use, to sell, assign, transfer and set over all or any part of the said stock; and for that purpose to make and execute all necessary acts of assignments and transfer, and one or more persons to substitute with like full power, hereby ratifying and confirming all that ...... said attorney or .... substitute or substitutes shall lawfully do by virtue hereof.

In witness hereof .... hereunto set .... hand and seal, the ...... day of ......, one thousand eight hundred and fifty ....

Sealed and delivered in the presence of ............

These certificates, with the blank assignment and power of attorney upon them, were printed and bound in books with margins for entering the time of issuing the certificate, the number of shares, the number of the certificate and to whom issued; which margins remained bound in the books

after the certificates were cut out and issued, and constituted a memorandum of all the certificates issued; these books were furnished by the company to the transfer agents. A stock ledger was also kept, in which each stockholder was credited with the shares transferred to him and debited with those transferred by him, and in a separate column in each stockholder's account was entered the number of shares represented by each certificate issued to him and the number of the certificate, and when a certificate was surrendered, a line was drawn through this entry, so that the uncanceled charges in the certificate column indicated the amount of each stockholder's stock represented by outstanding certificates, and by a comparison of the aggregate of such charges with the aggregate balances of every stockholder's account, any over-issue of certificates would be made to appear. These books were not accessible to the public, and dealers in stock had no means of information as to the title of parties proposing to dispose of stock, except such as was furnished by the certificates above mentioned or by the agents of the company.

That on the 3d day of February, 1847, Robert Schuyler was appointed transfer agent of the company at the city of New York, and a transfer office was established in that city; other offices and agencies were also established in the cities of Boston and New Haven. From that time forward to and including July 3d, 1854, the entire control and management of the transfer office and agency at New York was left in the hands of said Schuyler, without any examination or interference on the part of said company or its directors, he being also, during the whole period, the president of the company and one of its directors (and the meetings of the board of directors appear from the minutes to have been held at his office in New York).

That in August, 1851, the board of directors resolved to fill up the capital stock to $3,000,000, being 30,000 shares, and directed that the same be apportioned amongst the existing shareholders as then standing on the stock ledger; such distribution was made, and the stock (except 68 shares not

taken, which remained, in part, undisposed of till October 15, 1849) was taken by such distributees; that the stock originally subscribed, and that afterwards distributed, was, in most cases, transferred on behalf of the company by one of the transfer agents to the person entitled, and certificates were issued by such agent in the form above set forth; that during the time Schuyler was such agent, transfers of stock were made on the books to the transfer agents on account of the company, and such stock afterwards disposed of by such agents; that Robert Schuyler was a member of the firm of R. & G. L. Schuyler; that said firm held large amounts of the stock of the company, and from its organization to July 3, 1864, were large and constant dealers therein, and Robert Schuyler, as transfer agent during this whole period, attended to transfers and issued certificates to them in the same manner that he did of stock standing in the names of other persons, and no restriction appears at any time to have been put by the company upon his official action toward or with his said firm.

On the first day of February, 1848, Robert Schuyler, as such transfer agent, commenced the over-issue of certificates to his said firm, and on that day such over-issue was sixty shares; and such over-issue continued thenceforth, and at all times thereafter there was an over-issue of certificates in the stock account of R. & G. L. Schuyler. On the 20th of March, 1848, the over-issue by transfer commenced, and on that day the number of shares transferred by R. & G. L. Schuyler exceeded the number transferred to them by sixty shares. Such excessive transfers continued till January, 1849, the amount thereof fluctuating from time to time as transfers were made to and by R. & G. L. Schuyler, but the balance on the books of the company was against them at all times during that period. The excessive issues of such stock so transferred on the books of the company by R. & G. L. Schuyler, were credited to the transferees in their respective accounts, and when retransferred were charged in such accounts and credited to the new transferee. These transfers were made in great part under the power of attorney executed

in blank by R. & G. L. Schuyler indorsed on the over-issued certificates, by the holders thereof, and such certificates were, on making such transfers, brought in, surrendered and canceled. During this period, the amount of the over-issued certificates and over-issued transfers was not in excess of the 30,000 shares of the authorized capital of the company.

On the 10th of January, 1849, the excessive transfers amounted to 1,191 shares, but between that day and the 31st of January, shares were transferred to R. & G. L. Schuyler by various persons, sufficient to turn the balance of transfers in their favor. In August, 1851, when the 5,000 additional stock was distributed, the firm of R. & G. L. Schuyler had standing to their credit 854 shares; and in making the distribution and dividend in that month, the stocks previously transferred to the various persons holding the over-issued certificates, were treated by the company as genuine stock; there was at this time outstanding certificates issued to that firm, beyond the amount of their credits, for 1,277 shares; that the over-issued certificates continued to increase till October 17, 1853, at which time it had reached 7,042 shares, but the number of incoming certificates up to that time had not exceeded the credits of R. & G. L. Schuyler by transfers made to them, so that on the 17th of October, 1853, their account showed a balance by transfer to them of four shares. On that day a transfer of 100 shares was charged to them, and thenceforward to and including July 3, 1854, the balance of transfers against them continued to increase until it reached 17,497 shares, and at the same date the outstanding certificates against them amounted to 1,648 shares. All the certificates issued, including the false and over-issued certificates, were regularly entered in numerical order in the certificate books and stock ledger, and an examination of such books would at all times have shown what certificates were outstanding, and a comparison between the footings of the several books would have shown whether R. & G. L. Schuyler were or were not entitled to receive certificates.

The over-issued certificates and transfers were, in all cases in which judgments have been given to defendants, purchased

or received by them in good faith on the payment or advance of money. It was an established usage in the city of New York to make purchases of stock and make loans thereon on the faith of such certificates, with the assignment and power of attorney thereon executed in blank by the party to whom originally issued, and they were transferred in the course of business from hand to hand by delivery. It was a usage also to take transfers of stock in the course of dealing on the books of the corporation without receiving a certificate; and according to the ordinary mode of business transfers were not allowed by corporations without the surrender and cancellation of the outstanding certificate when one had been issued; and according to the usage among corporations in New York, dealers in their stock were not allowed access to their books, and it was not the custom for dealers to make examinations thereof. That the stock of the New York & New Haven Railroad Company was largely dealt in, in the city of New York by the delivery of certificates and assignments in blank, and large amounts of such certificates were constantly in circulation, and many of them purported to be issued to R. & G. L. Schuyler, and were signed by Robert Schuyler as transfer agent.

In many cases where valid certificates of stock had been issued to R. & G. L. Schuyler for stock actually belonging to them, and outstanding to their credit on the books at the time, and while such certificates, with the usual assignments and powers of attorney executed in blank were outstanding in the hands of *bona fide* holders, the stock was permitted to be transferred by R. Schuyler in the firm name to other persons, who took the same for value in good faith, without the surrender of the outstanding certificates. The rule on this subject, as established by the by-laws, was generally observed, but in the case of R. & G. L. Schuyler and a few other persons, it was disregarded by R. Schuyler and the clerks of his office.

. That the railroad company kept no bank account for the deposit of moneys; that money received on behalf of the company on construction account from time to time by

Robert Schuyler, as president or transfer agent, was, from time to time, deposited by him in the bank accounts of the firm of R. & G. L. Schuyler, and when payments were made by Schuyler on behalf of the company, the money was obtained by R. Schuyler; that large amounts were so obtained from time to time, and frequently from the firm of R. & G. L. Schuyler; that said moneys were drawn out from time to time as needed on their checks; that the money so obtained by R. Schuyler was raised by the said Robert Schuyler in the name of his said firm of R. & G. L. Schuyler indiscriminately on genuine and spurious certificates of the stock of said company; but it is not found to what time such moneys continued to be raised.

The firm of R. & G. L. Schuyler failed July 3, 1854, and R. Schuyler, on the morning of the 4th of July, by letter, resigned the offices of president, director and transfer agent, and called the attention of the board of directors to the over-issues appearing in the books. It is also found by the court that up to that time "there was no evidence of any actual knowledge by any of the other directors of any fraudulent acts on the part of Schuyler in the performance of his duties as transfer agent," and the evidence tended to establish that he stood high in the confidence of community as a man of integrity and business capacity; but the court further found "that a proper examination of the books by the directors would have enabled them to discover the frauds which were perpetrated by Schuyler, and that the board of directors was guilty of negligence in not making such examination, and in leaving the entire charge and control of the transfer of shares and giving of certificates with Schuyler without making such examinations," and that the plaintiffs, by their transfer agent or clerks, carelessly, negligently and improperly conducted, in relation to the transfer of the stock on the books of the company and the issuing of certificates therefor, in the allowance of transfers of shares of stock on the books of the company and in issuing certificates therefor, when no such shares existed, or when such certificates were not true, and in permitting transfers of spurious stock to be

made on the books of the company and certificates of spurious stock to be issued to persons who, in good faith, advanced money or other property thereon, and in permitting shares of stock to be transferred to other persons than those holding the certificates thereof without requiring a surrender of such certificates."

" That the defendants received their transfers of stock through the acts and neglect of the transfer agent, or of the officers of said company, or certificates issued by the acts and neglect of the transfer agent and officers of the company, or certificates of stock valid when issued, but rendered valueless by the fraudulent or negligent pursuance of transfers of such stock to subsequent *bona fide* purchasers without the surrender of the outstanding certificates; and have been misled by the acts and neglect of the transfer agent or officers of said company, in relation to such transfers and certificates, and have, in good faith, and without any violation on their part or in their knowledge of the by-laws and rules of the company, advanced money and other considerations on the faith of such transfers and certificates."

*Geo. F. Comstock* and *William Tracy*, for the plaintiffs.

*Chas. O'Conor* and *C. A. Rapallo*, for the defendant Vanderbilt.

*Mann & Rodman*, for Belmont, Hooper & Deane.

*J. Larocque*, for Chauncy and wife, and Alsop.

*W. Hutchins*, for Fisher, Denny & Co.

*W. H. Peckham*, for J. Surget.

*Jno. M. Buckingham* and *D. D. Field*, for Ketchum & Bement.

*Barlow & Kennedy*, for Rasbach & Crouse.

*Wm. M. Evarts*, for Edward Whitehouse.

*Judah & Dickman*, for Henry Leger.

*Weeks, De Forest & Foster*, for Talbot & Jones.

*C. N. Potter*, for Brown Bros. & Co.

*A. W. Lord*, for Ingraham & Dickinson.

*D. D. Lord*, for Amos R. Eno.

*J. S. Stearns,* for J. Milton Mackie.

*Dan. Marvin,* for Ketchum & Patten.

*W. Rutherford,* for De Coppet & Co.

*Jno. E. Parsons,* for Wm. S. Wetmore and Thos. H. Faile.

Davis, J.. The practice in this case has been anomalous, and, to some degree, without precedent. There is little danger, however, that any rule will be extracted from its complications likely hereafter to embarrass the courts. Unless, therefore, substantial rights have been violated by the course of procedure, I am opposed to remitting the case, or any of the parties to it, to another decade of litigation on any ground of mere irregularity.

The plaintiffs, after the discovery of the frauds of Robert Schuyler, found some three hundred persons in possession of supposed titles to portions of their capital stock, each of whom was clamorous that his title should be recognized as genuine, or that he should be compensated for injuries sustained from its falsity. Many of these persons had commenced suits at law to recover damages because of the refusal of the plaintiffs to recognize their alleged rights; and the rest, it was presumed, were about to commence such suits.

In this exigency, the plaintiffs invoked the equity powers of the court to shelter them from the impending storm by gathering all these persons and their claims into a single suit, in order, as they averred, that the duties and obligations of the plaintiffs, and the rights and claims of such persons, might be settled in one suit, and thereby a multiplicity of actions and the delay, expense and litigation attendant thereon, be avoided. They called upon the court to investigate the question of the validity of the certificates and transfers of stock held by the defendants; to separate the good from the bad and cancel the latter; to stop all actions then pending and consolidate and try the issues joined in them in this action, and to restrain all other parties from commencing actions upon claims growing out of such certificates and transfers; and to accomplish these ends, they asked and obtained process by injunction, under which the defendants

have been restrained from prosecuting elsewhere, any claims while this action was pending. It comes, therefore, with an ill grace from plaintiffs, if the defendants have rightly shown themselves entitled to recover damages in any forum, to insist that they can have no remedy in this suit. Having recovered judgment declaring these certificates and transfers spurious, upon a state of facts on which the court held that the defendants were also entitled to be compensated for their injuries, it would seem a hard measure of justice to turn these parties out to seek redress in the very multiplicity of actions which this suit was brought, in part, to avert.

It is a mistake to suppose that this action addressed itself to any single head of equity jurisdiction. It sought, it is true, the cancellation of illegal certificates and transfers, which were *prima facie* evidences of title to stock, on the ground that they were clouds on the title of the holders of genuine shares ; and chiefly in this aspect it was sustained on demurrer by this court (17 N. Y., 592) ; but it was also a "bill of peace" — to quiet titles, settle rights and prevent a multiplicity of actions ; and, as was said by Comstock, J., in the decision referred to, "the number of parties and the multitiplicity of actual or threatened suits, will sometimes justify a resort to a court of equity when the subject is not at all of an equitable character and there is no other element of equity jurisdiction." To which he might have added, that wherever those facts did justify such resort, a court of equity would fully dispose of all the rights and questions springing out of the subject matter of the suit as to every party, however multitudinous or complicated they might be. The action sought also to have the pending suits, in which portions of the defendants were plaintiffs, consolidated in this suit and their issues tried with it, and to prevent all of the defendants from prosecuting any claim growing out of the subject matter of this suit in any court of this State or elsewhere, for the reasons already quoted, and because the plaintiffs, as they said, "could not acknowledge or recognize any of the said false and *fraudulent certificates of stock, or any of the said transfers of stock ; or, as constituting any claim against the com-*

*pany without an adjudication by some court of competent jurisdiction requiring them to do so.*"

While, therefore, it was, in one aspect, a suit to remove a cloud upon a title and cancel the instruments creating such cloud, it had a far reaching and broader scope under which the plaintiffs hoped and intended to secure a judgment that would put at rest forever all possible claims against them, growing out of the Schuyler frauds. If it could be maintained to extinguish such claims, surely it can be to uphold them. The court did not err in so adjudging, if, while investigating the facts upon which the plaintiffs sought relief, it found that the same facts that entitled them to a part of what they sought also entitled the defendants to relief against them; and it was no undue stretch of equity jurisdiction to award the relief to both in the same action. The objection that by such a course the plaintiffs have been deprived of trial by jury, is without any sound foundation. The very nature of the action forbade such a trial. It is a primary consequence of a resort to a court of equity that trial by jury is no matter of right, and wherever the equity of the complainant's bill gives such a court jurisdiction, it draws to the same forum and mode of trial every question, whether its nature be legal or equitable, that can be legitimately considered within its scope. Under the Code, legal and equitable jurisdictions are combined in the same tribunal, but the principles of each remain distinctive and undisturbed. Whenever a plaintiff calls upon the court to exercise its jurisdiction upon principles of equity, he elects thereby his mode of trial and waives any constitutional right of trial by jury that he might at law have demanded, both as to the remedy he seeks and the defense that may be interposed.

Under the peculiar circumstances of this case, the court should not scrutinize, with critical care, the pleadings of the respondents, to see whether there be not some defectiveness in setting forth the nature and grounds of their claims to relief, or in demanding the same. The objections were not raised at the stage of the trial when it was most important to have the defects, if any existed, distinctly pointed out,

and when amendments could have been readily allowed; hence, on this appeal the plaintiffs should be regarded as having waived such objections, or the pleadings be considered as properly amended.

. In my opinion, the action of the General Term on the appeal from the judgment entered on the decision of the Special Term, in 1860, is not here to be reviewed, nor is it material to the case, if it were. Since that time the case has gone back to the Special Term, and the trial of the case has been completed by a disposition of all its issues, and another or amended judgment has been entered, from which an appeal was taken to the General Term, and the judgment affirmed. From this last judgment the appeal properly lies to this court. In its practical effect, the decision of the General Term on the first appeal, when considered in the light of subsequent proceedings, amounts to nothing more than a ruling that the case had not been fully tried and a final judgment rendered therein as to all the parties, and under that ruling it ordered the case back, with directions to the judge at Special Term to do what was, in its opinion, requisite to render the judgment complete. The action of the Special Term, in so far as it had gone, was in substance held correct, and *pro forma* affirmed; but it was instructed that its ruling that defendants could not recover cross-judgments in this suit was erroneous, and therefore the case was remitted to the original court, with directions to proceed in the necessary assessment, to entitle the defendants to judgments for damages, under the facts already found. If that judgment of the General Term was a final one, it should have been appealed from, within the prescribed time, to this court, by any party seeking to review it. If it was not final, and not appealable for that reason, then it has ceased to be of any moment, since the Special Term has continued the action, completed the trial, amended the judgment or entered a new one, from which an appeal has been taken to the General Term, and thence to this court. It is the judgment awarding the damages that is under review on plaintiffs' appeal, and not the judgment refusing them. The judgment of the Special Term *giving*

such damages is none the less the judgment of that court, because an appellate tribunal had instructed it that such ought or must be its judgment. It is not uncommon, when cases are sent back for new trial, for the appellate court to indicate the disposition that should be made of them, and for the original court to follow such disposition. And the practice in such case requires a new formal appeal to the General Term, and a new judgment by that court, before an appeal lies to this court.

We can only look at the action of the General Term on the first appeal, as an irregular proceeding by which the cause was got back to the original tribunal for complete judgment. Its effect has been an amended or complete judgment as to all the parties and all the issues, and that has become the final judgment in the case, and is now here for review.

The practice of the court, on the first appeal, was *sui generis*, and is not to be recommended for general imitation; but if this court should hold it not only to be irregular but wholly erroneous, we should still have the final judgment of the Special Term and the affirmance of that by the General Term, before us for review; because the merits of neither of those judgments can be said to have been affected by the intermediate irregularity, *but only the mode of getting at them.*

In short, I think, the last judgment of the Special Term is now to be considered *the judgment* in the action; and any party whose rights were affected by it was at liberty, within the prescribed time, to appeal from it; and the appeal would bring up any question properly arising in the progress of the trial; for, in legal contemplation, there has been but one trial and one judgment.

It follows, therefore, that the General Term erred in dismissing the appeals of Surget, and of Ketchum and Bement; and that this case is here for review on all its meritorious questions unprejudiced by mere matters of form or practice.

This somewhat summary disposition of the preliminary points of the case leaves an open path to its meritorious questions, some of which, however, may be disposed of

even more summarily.   One of these is the question whether
the stock purporting to be created by the false certificates
and fraudulent transfers of Schuyler can be valid stock of
the corporation and become part of its capital.   In the nature
of things this is impossible.   A corporation with a fixed
capital divided into a fixed number of shares can have no
power of its own volition, or by any act of its officers and
agents, to enlarge its capital or increase the number of shares
into which it is divided.   The supreme legislative power of
the State can alone confer that authority and remove or con-
sent to the removal of restrictions which are part of the
fundamental law of the corporate being; and hence every
attempt of the corporation to exert such a power before it is
conferred, by any direct and express action of its officers is
void; and hence every indirect and fraudulent attempt to do
so is void; for if such a result cannot be accomplished directly
by the whole machinery of the corporate powers, it is absurd
to suppose that it can be produced by the covert or fraud-
ulent efforts of one or more of the agents of the corporation.
The Special Term was, therefore, right in holding that the
spurious stock, attempted to be created by Schuyler in excess
of the capital, formed no part of the capital stock of the
company, but was utterly invalid; and it necessarily followed
from the decision of this court when the case was before it
on demurrer, that the plaintiffs were entitled to have all
certificates and transfers which represented such spurious
stock declared void and ordered to be canceled.

Another important legal proposition in the case is so clear
upon principle, and so distinctly settled by authority, that
nothing but confusion can flow from its discussion.   It will
bear no more than plain enunciation.   A corporation is liable
to the same extent and under the same circumstances as a
natural person for the consequences of its wrongful acts, and
will be held to respond in a civil action at the suit of an
injured party for every grade and description of forcible,
malicious or negligent tort or wrong which it commits, how-
ever foreign to its nature *or beyond its granted powers* the
wrongful transaction or act may be. (*Life and Fire Ins. Co.*

v. *Mechanics' Fire Ins. Co.*, 7 Wend., 31; Angell on Corp., §§ 382, 388, 391; *Albert* v. *Savings Bank*, 2 Mary. Dec., 169; *Goodspeed* v. *East Haddam Bank*, 22 Conn., 541; *Bissell* v. *Michigan Southern and Northern Indiana Railroad Co.*, 22 N. Y., 305–309, per Selden, J.; 1 Wend. Black. [note], 476; *Green* v. *London Omnibus Co.*, 7 C. B., 290 [N. S.]; *Frankfort Bank* v. *Johnson*, 24 Maine, 490; *Philadelphia and Baltimore Railroad Co.* v. *Quigly*, 21 How. U. S., 209, and cases cited by Campbell, J.)

It follows, from this proposition, that if it were established in this case that the corporation itself issued the false certificates of stock and permitted the fraudulent transfers of spurious stock, it would be liable to the party directly deceived and injured by that transaction. The incapacity to create the spurious stock would be no defense to an action for damages for the injury. On the contrary, that very incapacity, since it would render the certificate or transfer a fraud and deceit, would itself be the cause of the injury and the basis of recovery. No court would hear the corporation assert that its wrongful act was beyond its chartered powers, and therefore ineffective to charge it with the injurious consequences of the fraud. But in this case the false certificates were issued and the spurious stock transferred by an officer of the corporation. A corporation aggregate being an artificial body — an imaginary person of the law, so to speak — is, from its nature, incapable of doing any act except through agents to whom is given by its fundamental law, or in pursuance of it, every power of action it is capable of possessing or exercising. Hence the rule has been established, and may now also be stated as an indisputable principle, that a corporation is responsible for the acts or negligence of its agents while engaged in the business of the agency, to the same extent and under the same circumstances, that a natural person is chargeable with the acts or negligence of his agent; and "there can be no doubt," says Lord Ch. Cranworth in *Ranger* v. *The Great Western R. R. Co.*, "that if the agents employed conduct themselves fraudulently so that if they had been acting for private employers the persons for whom they were acting

would have been affected by their fraud, the same principles must prevail where the principal under whom the agent acts is a corporation." (5 House of Lords Cases, 86, 87; *Thayer* v. *Barlow*, 19 Pick., 511; 4 Serg. & Rawl., 16; 7 Wend., 31; *Frankfort Bank* v. *Johnson*, 24 Maine, 490; Story on Agency, sec. 308; Angel & Ames on Corp., sec. 382, 388.)

This brings us to consider the propositions on which the liability of the company to respond in damages to the defendants must depend. They are either general as applicable to all of the defendants, or special as growing out of the particular facts of some one or more of the defendants; and it is impracticable, without danger of injustice, to group the cases of all the defendants together and consider them in mass, however desirable that course might be in order to avoid prolixity. In one general proposition an inquiry is primarily involved into the duties concerning its stock which the corporation owed to the public and especially to all who might become dealers therein. The *charter of the company* was voluntarily sought and accepted. It created a private trading body having in view pecuniary gains and advantages. The legislature limited the capital and fixed the number of shares into which it might be divided, and declared them to be personal property to be transferred in such manner and at such times and places as the by-laws of the company should direct, and then handed over to the directors a discretion, restrained only by the laws of the State and the United States, to enact by-laws touching the disposition and management of the stock, the transfer of shares, the duties and conduct of officers, " and all other matters that might appertain to the concerns of the company." These powers were sought and granted with a view to well known and established commercial usages. It was doubtless a matter of choice to what extent the company would exercise them, but the directors chose to use them in their broadest significance. They proceeded to enact by-laws to regulate the transfer of stock and the issuing of certificates on such transfers. They adopted a form of transfer, of certificate and of assignment and power of attorney indorsed thereon, and gave them every character-

istic of negotiability in their power to confer. They sought the commercial center of this continent and there established a transfer office and agency, and thus gave and secured the most unbounded facilities for dealing in the stock. Their purposes, obviously, were to lay hold of the advantages which such facilities were sure to bring to the stock by enhancing its monetary and convertible value. This course was legitimate; but it brought with it corresponding duties and obligations. I cannot doubt but that upon general and long established principles of law, the corporation became bound to the exercise, in this branch of its business, of such ordinary care and skill as should afford to dealers a safe and reliable mode of acquiring title to its shares in the form of transfers and certificates as provided by its by-laws. "The law always imposes upon every one who attempts to do anything even gratuitously for another, some degree of care and skill in the performance of what he has undertaken. * * * Mere negligence, where there is no obligation to use care, as where a man digs a pit upon his own land and leaves it open, affords no ground of action, but where there is anything in the circumstances to create a duty to an individual or to the public, any neglect to perform that duty from which injury arises, is actionable." (Per Selden, J., in *Nolton* v. *Western R. R. Co.*, 15 N. Y., 444; *Coggs* v. *Bernard*, Ld. Raym., 909.)

It is upon this duty that the courts have established the rights which dealers acquire through the certificates of corporations who thus enter their stock upon the market, and the liabilities that flow from a refusal to permit the enjoyment of those rights. (*Deary* v. *Manhattan Co.*, 2 Denio, 118; *Kortright* v. *Buffalo Commercial Bank*, 20 Wend., 94, and 22 id., 368; *Pollock* v. *National Bank*, 3 Seld., 276; *Davis* v. *Bank of England*, 2 Bing., 393; *Mason Iron Co.* v. *Hooper*, 7 Cush., 183; *Sargent* v. *Franklin Ins. Co.*, 8 Pick., 90.)

I cannot, therefore, subscribe to the idea that the duties of the plaintiffs, in respect to their stock, were limited to themselves and existing shareholders. They extended also to the commercial community whose confidence and trade the plain-

tiffs invited, and who in turn were entitled to good faith and
fair dealing at the hands of the company; and they sprang
·into full vigor in behalf of every party who entered upon
such dealing.

The next important general inquiry is into the manner in
which the plaintiffs discharged those duties at their New
York agency, with a view to determine whether their conduct
has been of such a character that the law, in behalf of in-
nocent parties, and to prevent injustice, will imply authority
in the agent to do the acts that have occasioned the injury,
on the principle of *estoppel in pais*. This inquiry was not
involved in the case of the *Mechanics' Bank* against these
plaintiffs (3 Kern., 599), for the facts upon which it arises
were not then before the court, and the questions discussed
did not embrace them. The only question of estoppel con-
sidered in that case was the one arising on *the face of the
certificate itself*, and the learned judge who pronounced the
opinion was very careful to define the *limits of the authority
as they appeared in that case*, and to declare that the appoint-
ment, by its terms, did not include the acts, and that there
was "*no pretense that the authority conferred was ever en-
larged by any holding out or recognition of such acts.*"
(3 Kern., 636.)

The doctrine of implied agency, when it arises out of
negligence, I think, has its true basis in the principle
of *estoppel in pais*. That principle, as said by WILDE, B.,
in *Swan* v. *The North British Australasian Co.* (7 Hurlst. &
Norm., 603), is based on the injustice of allowing a party to
be the author of his own misfortune, and then charging the
consequences upon others, and "it all along implies an act in
itself invalid, and a person who is forbidden for equitable
reasons to set up that invalidity." The facts on which this
question arises are in part the same as those upon which the
extent of Schuyler's actual agency is to be determined, and
a condensation of them will now be made with a view to
answer both purposes. Schuyler was president of the com-
pany and a director. In February, 1847, and after the by-laws
were adopted, he was appointed transfer agent at New York.

His appointment was entirely general in its terms, but by necessary implication was subject, as to the mode of executing his duties, to the provisions of the by-laws in cases coming within their scope and meaning. The substance of the by-laws was, that all transfers of stock should be made by the shareholder on the transfer book in the form prescribed, at the office where the stock stood to his credit; that certificates for stock, with blank assignment and power of attorney thereon in the form prescribed, might be issued; and when issued no duplicate should be given and no stock be transferred without the surrender of the outstanding certificate (except in case of lost certificates, where special action of the board should be had); and that the stock might be transferred by the holder of a certificate under the power of attorney duly executed. Subject only to these by-laws, the board handed over to Schuyler all the power the directors themselves possessed in respect to the transfer of stock at the New York agency. They furnished him with blank transfers, certificates, assignments and powers bound in books, the stock ledger and other account books, and gave into his absolute control the keeping and management of such books and the employment and control of the clerical force necessary to that purpose. For more than seven years they left to him the unchecked and unquestioned management of the enormous business of this transfer office; and it was by no means limited to the mere duty of permitting transfers and issuing certificates upon transfers. It is found by the court that the stock originally subscribed for was in most, if not all cases, transferred by one of the agents in behalf of the company, and the complaint avers that certificates signed by a transfer agent *in the form above mentioned* were issued in such cases; that the stock subscribed for "was not all taken by or issued to parties subscribing therefor, but *much of it was sold by Robert Schuyler as transfer agent on behalf of the company,* and it was not all sold or issued until the 15th of October, 1849, when the last 28 shares were issued to Bishop & Miller" (finding 185); "that there were during the time while the said Robert Schuyler was transfer agent,

transfers of stock made *to the transfer agent* on the books of the company by holders of stock *for the account of the company*, and the stock so transferred was afterwards disposed of by such agents (finding 11); that the increase of five thousand shares made in 1851 was transferred by the agent to the parties entitled; that Schuyler was authorized by the board to sell, and did sell and transfer, certain small amounts of forfeited stock and fractional amounts not taken by subscribers on behalf of the company; "that the company kept no bank account for the deposit of moneys; that the money received on behalf of said company on construction account from time to time by Robert Schuyler, as president or transfer agent, was deposited by him in the bank accounts of R. & G. L. Schuyler;" "that when any payments were made by Schuyler on behalf of the company, the money was obtained by Robert Schuyler; that large amounts were so obtained from time to time and frequently from his firm of R. & G. L. Schuyler; that said moneys were drawn out from time to time by their checks as the same might be needed; that the money so obtained by R. Schuyler *was raised by the said Robert Schuyler in the name of his said firm, indiscriminately, on genuine and spurious certificates of the stock of the company;*" that *many of the transfers of stock were made by R. & G. L. Schuyler, by way of hypothecation, as security for loans to them.* (Findings Nos. 195, 196.)

From the outset, the firm of R. & G. L. Schuyler were large dealers in the stock of the company; so large, that apparently on the face of the books, more than the entire capital stock of the company passed through their account by transfer. That the by-law requiring the surrender of certificates on transfer of stock was generally observed, but in case of the Schuylers and some other parties they were not adhered to.

It appears also that the frauds of Schuyler commenced at an early day. On the 1st day of February, 1848, the first false certificate was issued to his firm, and at all times thereafter there was an over-issue of certificates, greater or less in amount, in the stock account of R. & G. L. Schuyler, as set

forth in the stock ledger. In March, 1848, transfers in excess of stock transferred to them, were first made on the books; these excessive transfers continued till January, 1849, fluctuating from time to time in amount, as transfers were made to and by them, but the books at all times during that period showed a balance against them. On the 10th of January, 1849, these excessive transfers amounted to 1,191 shares. This excess was occasioned, in part, by the bringing in and surrender of the excessive certificates by holders thereof, who thereupon transferred, under the power of attorney, to themselves or others, the stock represented by such certificates; between that date and the 31st of January, Schuyler obtained of the company and others shares of stock sufficient to turn the balance of transfers on the books in his favor, although there were then outstanding fraudulent certificates issued in favor of the firm in excess of their balance. In August, 1851, when the increased capital was issued, the books showed a balance of transfers in favor of the Schuylers of 854 shares; but there were then outstanding certificates in excess of this credit to the amount of 1,277 shares. The balance of transfers was, therefore, kept in their favor during this whole interval, by the fact that the holders of certificates had omitted to bring them in and have them canceled and the stock transferred, as rapidly as that firm had received transfers on the books to themselves. But so fast as these certificates did come in, and transfers were made under them, the stock was credited on the books to the transferees, and has ever since been recognized as valid stock. The whole amount thereof did not exceed the subsequently extended capital of $3,000,000 or 30,000 shares, but I am not able to see why it did not at most, if not at all times, exceed the then authorized capital of $2,500,000, or 25,000 shares. In some manner not disclosed, all these excessive issues were remedied, and made good stock; and so was all the stock purporting to be represented by the false certificates, that came in and were canceled on transfers prior to the 17th day of October, 1853. On that day R. & G. L. Schuyler had a balance of transfers in their favor of four shares, but there

were outstanding certificates to the amount of 7,042 shares, upon which no transfer had been made. From that date the excessive transfers again appear, and continue till July 3, 1854, at which time they had reached 17,497 shares, while the certificates had run down to 1,684 shares; making together an aggregate of 19,145 shares of spurious stock in excess of the enlarged capital. But from 1848 down to 1854, all these frauds were written down in the books of the company. A proper comparison between the certificate books and the stock ledger and transfer books, would at any time have shown whether the Schuylers were entitled to receive certificates, and when they were not entitled to transfer stock without surrendering certificates; and an examination of the account of R. & G. L. Schuyler in the stock ledger, was sufficient, according to the testimony of experts, by computation to have shown at any time the over-issue of certificates. The certificates were numbered consecutively, and so entered on the books, and there seems to have been no effort at falsification of the accounts. From 1849 to 1854, the clerks in the office knew of the over-issue of certificates. By the usage of corporations in New York, the books were not open to the examination of dealers, and by the orders of the agent they were kept shut against inspection. The court has found that it does not appear that any other director than Schuyler had personal knowledge of his fraudulent acts; but it has also found that the directors were guilty of negligence in not making any examination of the books, or of the conduct of the transfer office.

It is apparent that the use of ordinary care and diligence at any time after March, 1848, would have disclosed that Schuyler's management was fraudulent both as to the company and the public, and likely to lead to the disasters that have followed upon it. It is a mistake to suppose that his frauds commenced in October, 1853. They were equally gross in turpitude, though not in amount, for a period of five years before that date; and nothing but the ability of the company to increase the capital from two and a half to three millions, has prevented all excesses beyond the first named

sum from falling under the same ban of utter spuriousness. The arrangement, by virtue of which the transfers made on false certificates before the increase of the capital became genuine stock, may have been made in ignorance; but it was an ignorance based on a negligence so gross that *the fact* becomes as potent as though the truth had been known. It may have been in ignorance that the company received the benefit of "large sums" raised by Schuyler indiscriminately on genuine and spurious certificates. Charity may grant that, but equity cannot disregard the fact, for it was a duty to be wise. It is transparent throughout the case, that the board of directors, by passive submission or active surrender, handed over to Schuyler the substance of all their authority relating to their business in New York, and then for nearly seven years laid down to sleep in supine indifference at his feet. Aroused by the shock of the calamity which their folly has induced, are they now to look calmly over the wreck with no answer to its innocent victims but that of Macbeth to the ghost of Banquo? "If the managers faithfully perform their duty," said Strong, J., in *Beers* v. *Phœnix Glass Co.* (14 Barb., 360), "they exercise a constant and vigilant supervision over the acts of their officers, and where such acts are unauthorized or in opposition to their will, they should and probably do direct their discontinuance, and in case of willful and palpable violation of duty, dismiss the agent. If the directors of a company, no matter whether through inattention or otherwise, suffer its subordinate officers to pursue a particular line of conduct for a considerable period without objection, they are as much bound to those who are not aware of any want of authority as if the requisite power had been directly conferred." I cannot file my mind to the belief that equity attaches no consequences to such negligence upon the idea that it is not sufficiently proximate as a cause of the injury. The company placed in Schuyler's hands the very instrumentalities by which the injury was wrought. They imposed restrictions upon their use, but they omitted the safeguards that ordinary prudence would dictate, to discover or prevent their abuse. A wrong which ordinary

care will prevent, is in a legal sense, caused by the omission of that care where it is a duty to use it. At any stage, a discovery of Schuyler's past frauds would have arrested his career of crime. A discovery would have followed the examination of the books of the office, which were the only records of the vast stock transactions of the company at New York. An examination was a duty, because it was the obvious dictate of good sense as the easiest and safest check upon the agent's conduct. The long continued and reckless omission was therefore a culpable negligence, without the concurrence of which Schuyler could not have committed the frauds by which the defendants have suffered; for it was this omission of duty that left him with power to wield the weapons with which the company had armed him, and therefore it may be said to have led directly to the injurious acts.

In cases where the authority of an agent has been wholly withdrawn, the neglect of the duty to notify parties who have dealt with him, estops the principal from denying the continuance of the agency, although no power in fact exists. And so a retiring partner is bound by the acts of his former firm if he omit the duty of notice. In these cases, for omitting an act which would have prevented the injury, the truth, to wit, the actual want of authority, is shut out by the negligence; but the neglect does not cause the assumed agent to do the act which occasions the injury; it only suffers an opportunity to do it, to exist, which in law is equivalent. If ordinary care was due from the corporation toward its dealers so to manage its affairs that its agents should have no opportunity to commit fraud which such care would prevent, then the same principle is applicable here to establish the *proxima causa* which the law demands. It is not in such cases one of two *innocent parties* who is to suffer. The question is between an *innocent and a culpable party*, and, as was said by Denio, J., in the *The Bank of Genesee* v. *The Patchin Bank*, "I see no objection in applying the principle that where a party has, by his declaration or conduct, induced another to act in a particular manner, he will not afterwards be permitted to deny the truth of his admission

if the consequence would be to work an injury to such other person." (3 Kern., 316.)   The question of estoppel is one of ethics (per Bronson, J., in *Dezell* v. *Odell*, 3 Hill, 225), and is to be enforced where, in good conscience and honest dealing, it ought to be.  (*Welland Canal Co.* v. *Hathaway*, 8 Wend., 483.)  "The principle," says Chancellor Kent (2 Com., 620, note c), " that pervades the distinction on this subject rests on sound and elevated morality.   There must be no deception anywhere.   The principal is bound by the acts of his agent if he clothe him with powers calculated to induce innocent third persons to believe the agent had due authority to act in the given case."  "He who created the trust, and not the purchaser, ought to suffer." (Note d.)

On the question of *privity* in any view of this case, I have no difficulty.   If the act of the agent can be charged home upon any principle, upon the corporation, then, as was said in the *Bank of Kentucky* v. *The Schuylkill Bank* (1 Pars. Eq. Cas., 180), "the *bona fide* holder of any certificate issued by the transfer agents has a primary and direct claim, either to be admitted as a corporator, or if that is impracticable, from the excessive issue of stock, to be compensated for the fraud practiced upon him."   To entitle the aggrieved party to sue, in such case, no privity is necessary, except such as is created by the unlawful act and the consequential injury, because the injured party is not seeking redress upon contract, but purely for the tortious act in the commission of which the contract is an accidental incident. (*Allen* v. *Addington*, 11 Wend., 374; *Thomas* v. *Winchester*, 2 Seld., 397; *Scott* v. *Shepherd*, 3 Wils., 403; *Gerhard* v. *Bates*, 2 Ell. & Bl., 489; *S. C.*, 20 Eng. L. & Eq., 129; Redfield on Rail., 61; *Kortright* v. *Buffalo Commercial Bank*, 22 Wend., *ubi sup.*)

That the *Mechanics' Bank* against these plaintiffs was not decided on any question of want of privity, we have the authority of the judge who pronounced the opinion: "We certainly," he says, "did not put our judgment upon the ground that the plaintiffs were not in privity of dealing with the defendants by reason of the non-negotiable character of the certificates, and,

*therefore, could not sue for fraud.*" (*Farmers' and Mechanics' Bank* v. *Butchers' and Drovers' Bank,* 16 N. Y., 151.)

I am, therefore, of opinion that the plaintiffs are estopped by the facts and circumstances of this case, to deny the authority of Schuyler to do the acts from which the injury to the defendants has arisen.

But conceding that the whole question of this case is governed by the law of principal and agent, it becomes of grave significance to ascertain the scope and extent of the powers conferred on the agent. Herein, I think, the case essentially differs from that of the *Mechanics' Bank.* (3 Kern., 399.) The question of that case is stated by COMSTOCK, J., in 16 N. Y., at pages 154, 155, with succinctness and accuracy. He says: "In *that case, the transfer agent of the defendants' corporation was authorized to sign and issue certificates of stock on a transfer from one shareholder to another upon the books and on the surrender of the previous certificates.* The agent, for his own purposes, signed and issued certificates to a large amount where there had been no such transfer or surrender. These unauthorized and spurious instruments were in form precisely like those that were genuine and authorized. Trusting to their false appearance, the plaintiffs took one of them by transfer and advanced money upon it, which they recovered in the New York Superior Court. We held they could not recover, and reversed the judgment, placing our decision prominently upon the ground *that the acts of the agent were not within the real or apparent scope of the power delegated to him.*"

It *now appears* that the agent, in addition to the power thus stated, had authority also *to issue certificates in precisely the same form,* to the original subscribers for the stock, and to some extent did do so; that he had authority to dispose of the stock of the company not taken by the original subscribers (of which there was a large amount), and issue certificates in the same form to the purchasers; that he had authority to dispose of certain forfeited shares, and in such case issue like certificates; that he had authority to receive transfers to himself of stocks on behalf of the company, and

transfer the same to purchasers and issue like certificates to them; that before the increase of the capital to 30,000 shares, he did issue to his own firm a large number of false certificates which became the basis of transfers on the books to third parties, and by some arrangement were absorbed into the enlarged capital as genuine stock; that he acted to some extent as financial agent of the company, and through his firm raised large amounts, "indiscriminately, on genuine and spurious certificates of stock," which were paid out on the check of the firm on behalf of the company and on its construction account; that to him was intrusted the keeping of all the stock accounts of the company and its dealers at the New York office, and in those accounts he entered all his transactions, both false and genuine; that the books were kept closed to dealers; that his management of the affairs of the office, and of all these various matters, was never investigated or questioned.

It is in all these facts that we are now to seek for "the real or apparent scope of the power delegated to him." As we descend from the sharp promontory of the *Mechanics' Bank case* to this broad plane of powers and their mode of use, we stand amongst new and far different lights and shadows. We find ourselves quite unable to say, with the able jurist in that case, " *He* (Schuyler) *had no power to sell stock at all, and none to issue certificates except as incidental to a sale between existing stockholders, and then it depended on the condition precedent of a transfer on the books and a surrender of a previous certificate for the same stock.*" Nor to say, " *His appointment in its very terms, which all dealers are supposed to have been acquainted with, did not include his acts, and there is no pretense that it was ever enlarged by any holding out, or recognition of his acts.*"

When his certificate, regular in form in all respects, is offered in the market, the buyer is not able to refer it to the narrow restrictions of the by-law, for how does it appear that it is not one issued to an original subscriber, where there was no transfer to be made, and no prior certificate to be surrendered; or that it is not one issued to a purchaser of the

original stock which Schuyler was empowered to sell and
certify in this manner; or that it is not of stock that has
been transferred to the agent on account of the company and
which he was likewise authorized to sell; or that it was not
some of the forfeited shares which he was directed to sell
and certify; or that it was not of the kind which, by "*some
arrangement*," is absorbable into the capital as genuine, even
if it be in fact spurious; or that it is not issued to raise
money for the benefit of the construction fund of the com-
pany; or that it is not of the spurious kind which the company
have heretofore allowed to be cured by a subsequent acquisi-
tion of stock by the Schuylers, and a transfer thereafter
under the power.

Whether it does not belong to some one of these classes
there are no earthly means of ascertaining save by the rep-
resentation of the agent.   The books are sealed; but if open
and most thoroughly investigated they would not necessarily
negative the power to issue for some of the purposes for
which authority had been given, directly or by recognition;
for even if run down to absolute spuriousness it is still open
to say, this is of the kind of spurious certificates upon which
the company raise money for their construction accounts,
or the kind which they legitimatize by subsequent arrange-
ments of the capital; or the kind which, by the custom of
dealing becomes good, if a transfer be made under it at a
moment when the Schuyler firm happens to have so much
stock to its credit on the books.   And the accounts for seven
years show that all these kinds are treated on the same
footing as genuine shares.

It is a well recognized branch of the law of principal and
agent, that without any express or special appointment, an
implied agency may arise from the conduct of a party. (Story
on Agency, § 54.)   "Where a person has recognized a course
of dealing for him by another or a series of acts of a particu-
lar kind, an implied agency is thereby constituted to carry on
the same dealing or to do acts of the same character. * * *
There may be seeming contradictions of the fundamental
doctrine that a principal is bound only by such acts of his

agent as he has duly authorized. This presumption or im-, plied agency is one of these, because a man may have, accepted supposed acts which he never authorized, and so be bound as to third persons by similar acts." (Per Comstock, J., 16 N. Y., 145, 146).

There is nothing gained to the plaintiffs by the fact that the certificates are made to the firm of R. & G. L. Schuyler, for so were all those which, prior to Oct., 1853, became good by a transfer when that firm happened to be in credit on the books of the company; so were those used to raise money for construction; and so of those which went in under the increased capital. It is a general rule that an officer or agent is not to be permitted, under a general power, to certify in his own favor. (*Claflin* v. *The Farmers' Bank*, 25 N. Y., 293.) But in this case that rule is not applicable, for it clearly appears that from the outset this firm were very heavy dealers in the stocks of the company, that its business was all conducted at this agency, and that Robert Schuyler at all times certified to it as to other dealers. The long acquiescence of the company in this practice, and its actual ratification in some of the cases above mentioned disarm this objection of all force. (Ang. & Ames on Corp., 216; and see *Bradly* v. *Richardson*, 2 Blatch. C. C. R., 343; *S. C.*, 23 Vt., 720; Story on Agency, § 54.)

In this view of the extent of the authority with which Schuyler was clothed by the company, either by direct appointment or by recognition and ratification, or by actual enjoyments of the fruits of his acts, or by long acquiescence therein from which a presumption or implied agency arises, I have come to the conclusion that the issuing of the certificates by him must be held to be within the scope of the real and apparent authority which he possessed; and the remedy of the defendants is not prejudiced by the fact that he used and intended to use the avails for his own purpose. In short, they stand precisely in respect to the remedy where they would if the board of directors had issued the same certificates in fraud of their powers under the law, and obtained the defendants' moneys thereon.

But these views do not dispose of a question that has been argued in this case with an elaboration and power seldom equaled in a court of justice. From the manner in which the decision of the judges is stated in the *Mechanics' Bank case*, it is difficult to tell what precise points were designed to be passed upon by the court. It is open to conjecture that the case may have passed off on the ground of want of privity between the plaintiffs and defendants, as was intimated by Selden, J., in *The Farmers' & Mechanics' Bank* v. *The Butchers' & Drovers' Bank* (16 N. Y., 142), or on the ground, as suggested by H. R. Selden, J., in *Griswold* v. *Haven* (25 N. Y., 598), "that Kyle, to whom the certificate issued, being privy to the fraud, had of course no claim against the company, and that his assignees could have no greater rights than himself;" or upon the mistaken idea that the court of errors, in reversing the *The North River Bank* v. *Aymar*, has settled the law adversely to the opinion of the Supreme Court in that case.

But whatever may have been the views of other members of the court, there is no mistaking the ground on which the judge who pronounced the opinion intended to put the liability of a principal for the acts of an agent. It is, in brief, *that a principal is bound only by the authorized acts of his agent.* The proposition involved was fairly put by the learned judge in this form: "Suppose an agent is authorized by the terms of his appointment to enter into an engagement, or series of engagements, on behalf of his principal, and while the appointment is in force he fraudulently makes one in his own or a stranger's business, but in the form contemplated by the power, and which he asserts to be in the business of his employer by using his name in the contract, can the dealer rely upon that assertion, or is he bound to inquire and to ascertain at his peril whether the transaction is not only in appearance but in fact within the authority? According to the decision of the Supreme Court of this State, in the case of *The North River Bank* v. *Aymar* (3 Hill, 262), he can." The judge then proceeds to show that the case cited had been reversed by the court of errors; and then to

discuss the question with his own clearness and vigor, reaching a conclusion which he expresses in these words: "The appearance of the power is one thing, and for that the principal is responsible. The appearance of the act is another, and for that, if false, I think the remedy is against the agent only. The fundamental proposition, I repeat, is, that one man can be bound only by the authorized act of another. He cannot be charged because another holds a commission from him and falsely asserts that his acts are within it."

The counter proposition was again stated by SELDEN, J., in *The Farmers' & Mechanics' Bank* v. *The Butchers' & Drovers' Bank*, in this form: "It is, I think, a sound rule that when a party dealing with an agent has ascertained that the act of the agent corresponds in every particular in regard to which such party has or is presumed to have any knowledge with the terms of the power, he may take the representation of the agent as to any extrinsic fact which rests peculiarly within the knowledge of the agent and which cannot be ascertained by a comparison of the power with the acts done under it."

Manifestly, here is an "*irrepressible conflict*" between these propositions, and we are called upon to determine which expresses the settled law of this State. I think the problem is solved whenever the question whether the decision of the Supreme Court in *The North River Bank* v. *Aymar* (3 Hill, 262), is authoritative as law, is answered; and for this, I have the emphatic assent of COMSTOCK, J., as above quoted. That case stands altogether upon the doctrine of agency. The bank held the power of attorney under which the agent acted. The paper, on its face, notified the bank that it was made by the agent. The power, by express words, limited the authority to notes made in the business of the principal. The character of the paper was, therefore, of no moment on this point, for its negotiability could not shut out a question which arose on the face of the instruments. (See per SELDEN, J., in *Griswold* v. *Haven*, 25 N. Y., 601, and per COMSTOCK, 16 N. Y., 153, 154, 155.) The paper, in fact, was not made in the business of the principal. The question was, *where*

*the peril of that fact rested;* and its solution altogether depended upon the question, was the bank " bound to inquire and to ascertain at its peril whether the transaction was not only in appearance but in fact, within the authority ?" The court appreciated the point, and therefore discussed and decided the question distinctively, on the law of principal and agent.

The further history of that case is shown by Judge Comstock in his opinion in *The Mechanics' Bank case* (3 Kern., 633), and more fully in his dissenting opinion in *The Butchers' and Drovers' Bank case* (16 N. Y., 153, 154). As *The Mechanics' Bank case* left *The North River Bank case,* the latter would be deemed not law. But the same question arose in *The Farmers' and Mechanics' Bank* v. *The Butchers' and Drovers' Bank,* and it became essential to determine whether the reversal by the court of errors of *The North River Bank case* had settled the law adversely to the decision of the Supreme Court. Judge Comstock earnestly insisted that it had (16 N. Y., 154), but in this he stood alone. Selden, J. (at page 138), assigned reasons for holding the question still open for examination, and after a very full examination declared that the case was properly decided by the Supreme Court. Denio, Ch. J., and Brown, J., delivered opinions, both agreeing with Selden, J., in approving the decision of the Supreme Court. " I am clearly of opinion," said Denio, Ch. J., "that the case of *The North River Bank* v. *Aymar,* was correctly adjudged in the Supreme Court. If the court of errors laid down a different rule in reversing that judgment, they ran counter, as I think I have shown, to a strong course of adjudication in that court and in the Supreme Court, and overturned a legal position which was then well established in this State, and has since been repeatedly acted upon." In *Griswold* v. *Haven* (25 N. Y., 595), the same question arose ; and upon the precise point now under consideration — whether the decision of the Supreme Court in *The North River Bank* v. *Aymar,* is sound law — I understand there was no dissent from the opinion of H. R. Selden, J., which held it to be so. In *The Exchange Bank* v. *Monteath*

(26 N. Y., 505), the question of its authority again very sharply arose. When that case was first at the bar of the General Term, that court followed *The North River Bank* v. *Aymar*, as reported in 3 Hill, regarding it as a decisive authority. After a new trial, the case came again to the General Term, but in the meantime the opinion of Comstock, J., in *The Mechanics' Bank case*, had been published. The court regarded that as establishing a different doctrine, and as showing also that *The North River Bank case* had been overruled by the court of errors. It, therefore, reluctantly followed what it regarded as the later authority. But this court reversed the General Term, and declared that the doctrine of the case of *The North River Bank* v. *Aymar*, must now be regarded as established on an impregnable basis. "It is," said Davies, J., "well sustained by authority, sound reasoning and well established principles, and it should be firmly adhered to by the courts." If ever a case, discrowned by reversal, was lifted to its feet and restored to authority by adjudication, *The North River Bank* v. *Aymar* has been; and its vindication is all the more signal because of the ability with which its chief antagonist has conducted the remarkable warfare against it.

We have already seen what principle was involved in that case, and it is impossible to escape the conclusion that the law of this State, as settled by adjudication at this day, is, as put by H. R. Selden, J., in *Griswold* v. *Haven*, "*That where the authority of an agent depends upon some fact outside the terms of his power, and which, from its nature, rests particularly within his knowledge, the principal is bound by the representation of the agent, although false, as to the existence of such fact.*" The contrary rule, though asserted with confidence and vindicated with great force in the case of *The Mechanics' Bank*, was not necessarily adopted by the court, and that case does not so determine. It may with confidence be asserted that all the cases in this State, both before and since, lay down a different rule from that supposed in the *Mechanics' Bank case*, to have been established by the court of errors; and so do the elementary writers

upon whom we are accustomed to rely. (Story on Agency, 452; Paley on Agency, by Lloyd, 294, 301, 307; Bacon Abr., Tit. Master and S., K; 2 Kent Com., 620, notes, 1 Blk. Com., 432.) It were long, by quotation, to show that the cases just noticed necessarily rest on this doctrine. A short allusion to their facts must suffice. The condition of the authority in *The North River Bank* v. *Aymar*, was that the paper should be made in the business of the principal. In *The Butchers' and Drovers' Bank case*, that the drawee should have funds in deposit enough to pay the check. In *Griswold* v. *Haven*, that the grain for which the receipt was given should actually have been received. In *Exchange Bank* v. *Monteath* (so far as it rested on a question of agency), that the drafts should be for the use and benefit of the defendant's line of boats. In each of these cases, the extrinsic fact which constituted the condition of the authority was peculiarly within the agent's knowledge, and was necessarily represented to exist by the execution of the agent's powers. It might or it might not be discovered by inquiry. So in this case, in the narrow view in which we are now considering it, the condition upon which the agent could issue the certificate was, a transfer in the books and the surrender of a previous certificate, if any had before been issued. These facts are wholly extrinsic and peculiarly within the knowledge of the agent, as part of the special duties to be attended to by him, and were represented by him to exist by the certificate itself. I can see no shade of difference between the question in this case and in those cited, and which seem to me to settle the law. The rule which governs this class of cases, in my judgment, rests upon a sound principle. As was said by Selden, J., in *Griswold* v. *Haven*, "The mode in which the liability is enforced in all these cases, is by *estoppel in pais*. The agent or partner has in each case made a representation as to a fact essential to his power, upon the faith of which the other party has acted, and the principal or firm is precluded from controverting the fact so represented." It goes back to the celebrated aphorism of Lord Holt, in *Hern* v. *Nichols* (1 Salk., 289), "For seeing

somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver, should be a loser than a stranger," or as more tersely expressed by Ashurst, J., in *Lickbarren* v. *Mason* (2 T. R., 70), "Whenever one of two innocent parties must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." (Story on Part., § 108, and authorities there cited.) In truth, the power conferred in these cases, is of such a nature that the agent cannot do an act appearing to be within its scope and authority, without, as a part of the act itself, representing expressly or by necessary implication, that the condition exists upon which he has the right to act. Of necessity the principal knows this fact when he confers the power. He knows that the person he authorizes to act for him, on condition of an extrinsic fact, which in its nature must be peculiarly within the knowledge of that person, cannot execute the power without as *res gestae* making the representation that the fact exists. With this knowledge he trusts him to do the act, and consequently to make the representation which, if true, is of course binding on the principal. But the doctrine claimed is that he reserves the right to repudiate the act if the representation be false. So he does as between himself and the agent, but not as to an innocent third party who is deceived by it. The latter may answer, you intrusted your agent with means effectually to deceive me by doing an act which in all respects compared with the authority you gave, and which act represented that an extrinsic fact known to your agent or yourself, but unknown to me, existed, and you have thus enabled your agent, by falsehood, to deceive me, and must bear the consequences. The very power you gave, since it could not be executed without a representation, has led me into this position, and therefore you are estopped in justice to deny his authority in this case. By this I do not mean to argue that the principal authorizes the false representation. He only in fact authorizes the act which involves a representation, which, from his confidence in the agent, he assumes will be true;

but it may be false, and the risk that it may he takes because he gives the confidence and credit which enables its falsity to prove injurious to an innocent party. I have already shown how this principle in many cases sustains liability after all actual authority has been withdrawn, as between the principal and parties who have a right to infer that the authority continues.

The contrary doctrine would be singularly inconvenient, if not absurd, in practice. For instance, under a general power to draw bills, which means, of course, only in the business of the principal, no party could safely take a bill drawn by the agent without pursuing the inquiry whether it was drawn in such business, to extremes. If the peril is on the party to whom the bill is given, nothing short of personal application to the principal himself can relieve it, for nowhere short of that is absolute certainty. Every intermediate appearance or representation may be false or deceptive, and the rigid rule of *actual authority* will be satisfied with nothing less than absolute verity. So, then, the general power carries no safety whatever, since each bill made under it must be verified as to extrinsic facts by resort for perfect security to the principal himself.

Or to bring the illustration nearer to this case: It is claimed that every receiver of a stock certificate, executed by an agent, must verify, at his peril, the extrinsic facts that a transfer of the stock has been made and the former certificate surrendered. But how? If he go to the board of directors they can only refer him to the transfer agent or the books kept by him, for these are alone their sources of information. If he resort to the books they are at best but other representations of the agent which, if they in form show a transfer, may still be deceptive, and nothing but a transfer of *actual stock* will answer the condition. He must therefore trace the lineage of the stock represented by the certificate to some point behind which no "strain upon the pedigree" will enable the corporation to bastardize the issue. Such a rule would be vastly detrimental to the business interests, both of corporations and of the public.

It would be far better to establish a rule that no man shall take an instrument made by an agent without first having the principal's certificate that it is genuine and authorized; and even this would be impracticable in corporations, for every new certificate, being another act of an agent, would only open a new circuit of inquiry. But such is neither the policy nor good sense of the law.

It is a mistake to suppose that the conventional rule of commercial negotiability has anything to do with this question, except in cases where the paper carries no notice on its face that it is made by somebody assuming to be an agent. That rule stands upon an arbitrary doctrine of the law merchant and not at all upon any principle of estoppel. It extends only to instruments which usage or legislation has brought within it; and its substance is, that by force of the arbitrary rule the possessor of such negotiable instrument has power to give by delivery to a *bona fide* purchaser for value, a good title notwithstanding any defectiveness in his own. Hence, under it a finder or a thief may confer such title with none in himself, not because the loser is estopped by his misfortune from asserting his rights, but because from real or supposed commercial necessities, "*ita lex est scripta.*" But it is a fixed requisite of the rule that the buyer shall be for value *without notice*, and therefore nothing that gives notice on its face is, in that particular, within the rule. So an instrument that shows on its face that it is made by one man for another, at once warns the taker to inquire if the assumed agent be authorized, and that question becomes one independent of the arbitrary rule of the law merchant and dependent on the doctrines that govern the law of principal and agent. (*Atwood* v. *Munnings*, 7 B. & C., 278; *Fearn* v. *Felica*, 8 Scott N. C., 241.)

I concur, therefore, with Judge Selden, when he asserts that in no respect, except as it touched the question of privity of contract, was the negotiability of the paper of any importance in the case of *The North River Bank* v. *Aymar* (25 N. Y., 602). In that case it appeared on the face of the paper that it purported to be made by an agent. A different

rule as to the effect of negotiability may well obtain where the paper is negotiable within the law merchant, and bears on its face no notice whatever that it is made by some party other than the one it purports to charge, as where it is made in a firm name, or in the form and by the officers, through and by which a corporation can by law issue its authorized evidences of debt.

We have already seen how far privity is essential in actions of tort. (Redfield on Railways, 61 and note; *Gerhard* v. *Bates*, 20 Eng. L. & Eq., 129, &c.)

I shall not inquire how far the English cases, and especially the leading case of *Norway* v. *Grant* (10 C. B., 665), so much relied upon, may be in conflict with the law of this State. Both the Judges Selden have sought to show that *Norway* v. *Grant* is distinguishable from the cases under their consideration, and I will only add that if they did not succeed in pointing out the distinction, and the case really stands in conflict, *so much the worse for that case.*

We may come back, therefore, to the solid ground of *The North River Bank* v. *Aymar*, regarding it only as shaken down to greater firmness by the severe ordeal of *The Farmers' and Mechanics' Bank case*, and with confidence declare the true doctrine of this branch of the law of agency to be, that [where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, a third person dealing with such agent in entire good faith pursuant to the apparent power, may rely upon the representation, and the principal is estopped from denying its truth to his prejudice.] In *Griswold* v. *Haven*, this rule was distinctly settled. The dissenting opinion touched only the right to maintain the form of action brought in that case, but a majority of the court held that the representation of the agent not only charged the principals, but estopped them from denying the actual possession of the wheat asserted to be in store, so as to defeat an action of trover or replevin to recover the property. In this view I see

no ground upon which the plaintiffs can, in this case, be permitted to deny that Schuyler was acting within the scope of his authority in issuing the false certificates; and they are therefore to be treated as though issued by the board of directors. Considering them of that character, the question of estoppel, as it arises upon their face, that is, whether the corporation is estopped from saying that they were not genuine representatives or muniments of title to stock, was rightly disposed of by the opinion of Comstock, J., in *The Mechanics' Bank case.* And it was in that view, that is, regarding them as instruments capable, upon some notion of estoppel, of being specifically enforced, that he alluded to the supposed want of privity in the estoppel itself between the holder in that case and the corporation; but he quite distinctly declined to pass upon the question of the liability of the corporation if the certificate was to be treated as the act of the board.

But the liability of the corporation for a wrongful injury growing out of an act of the directors in excess of the chartered powers, was afterwards vindicated and settled in *Bissell* v. *The Michigan Southern & Northern Indiana R. R. Co.* (22 N. Y., 258), and it stands well upon the grounds of either of the learned opinions in that case.

It was established by the Court of Chancery in England a century ago, in *Ashby* v. *Blackwell* (2 Eden, 299). In that case, one question was, whether a party to whom the secretary of a bank company had permitted a transfer of shares on a forged power of attorney, was entitled to recover of the company the sum he paid on such transfer. The secretary in that case, in violation of the rules of the company, had permitted the transfer under a letter of attorney which did not comply with the rules. It was contended that the purchaser ought to have inquired into the reality of the authority. Lord Ch. Northington declared the conduct of the secretary to have been gross negligence, chargeable upon the company, and he held that the company "must and ought to answer for their and their servants' negligence." "It will be of no public detriment," said he, "if my decree tends to make the directors of public companies to attend to the

business of those companies and teaches them not to leave the important transactions of millions to undirected clerks and bookkeepers." He accordingly adjudged the company to pay the vendee the amount he had paid for the stock; which is the judgment rendered in this case.

I am, therefore, for a general affirmance of the judgments in this case on the plaintiffs' appeal.

I shall proceed, as briefly as possible, to consider the cases of defendants, who are parties to this appeal, in the light of the different facts found in them; and for that purpose shall classify the defendants so far as practicable.

First. There is a class of defendants who were purchasers of stocks in good faith and for value, of persons to whose credit such stock stood on the books of the company at the transfer office at the time of such purchase and who held certificates in due form therefor. On such purchases, the outstanding certificates were surrendered, transfers made on the books in due form, and new certificates issued to the purchaser, who thereupon paid the purchase price to his vendor. These certificates are adjudged spurious because their origin is found to have been, more or less remotely, in over-issues by Robert Schuyler to his firm.

Second. Another class are defendants who made purchases of parties who had credit on the books of the company for the stock sold, but no certificates, and who, on the sale, transferred the stock on the books in due form to the purchasers — who, in some instances, took certificates and in others not. In some cases in this class, it is proved that the money for the stock was not paid till after inquiry at the office showed that the transfer had, in fact, been made.

Third. Another class is of parties who loaned money upon certificates held by the borrowers, to whose credit the stock stood on the books of the company, and who at the time of making such loan or subsequently, surrendered the certificate and transferred the stock on the books and took out new certificates in due form.

The stock held by these two classes has been also adjudged spurious, because it originated in some like over-issue of the transfer agent.

It will be seen that in these cases where new certificates have been issued by the transfer agent, the letter of his authority in its most limited sense has been pursued. The extrinsic facts upon which the power of the agent depended, apparently existed. Stock stood on the books to the credit of the party making the transfer. The transfer was made in due form. The outstanding certificate was surrendered and canceled, and thereupon the new one issued. To all appearance the act was within the real and apparent scope of the authority, and every condition of the power fully complied with. But a judicial investigation has shown that this apparent stock credited on the books, was not real. That at some remote period, it had its origin in a fraudulent over-issue. The question is, does the peril of that fact rest on the buyer? I think it does not; but I am constrained to admit, that if the position of the appellants' counsel be sound, I do not see why it must not. The question is only carried back a step farther; that is, to the right of a dealer to buy stock, relying on the books of the company as evidence of the ownership of his vendor. But the books are themselves only representations made by agents, and by no means conclusive in every sense. The credit is a deceptive one, because the stock has no real existence, and if the condition of the power be that there must be an actual transfer of *stock*, an unreal transfer, however complete its resemblance to reality, does not answer the condition. No matter to what disastrous consequences the rule may lead, it cannot be satisfied without holding that the peril that all appearances of genuineness shall be founded in absolute fact, constantly rests upon the dealer.

The same thing is true of the transfers upon the surrender of certificates, where no certificate had issued. Unless we are to hold the company to the duty of keeping correct books, so that those who refer to and rely upon them shall be protected, there is no remedy. The corporation may mislead the community until thousands are ruined, and be itself entirely protected by being able to say, our agents had no authority to give credits for stock where none existed. The evidence

to a corporation of its stockholders is its stock ledger, or the books kept for the express purpose of determining its stockholders. (*Gray* v. *Portland*, 3 Mass., 385, per SEWALL, J.)

Dealers are entitled to rely upon that evidence. As was said by BEST, Ch. J., in *Davis* v. *The Bank of England* (3 Bingham, 393), "If this be not law, who will purchase stock, or who can be certain that the stock he holds belongs to him? It has ever been an object of the legislature to give facility to the transfer of shares in the public funds. This facility of transfer is one of the advantages belonging to this species of property, and this advantage would be entirely destroyed if a purchaser should be required to look to the regularity of the transfer, to all the various persons through whom such stock had passed. Indeed, from the manner in which stock passes from man to man, from the union of stocks bought of different persons under the same name, and the impossibility of distinguishing what was regularly transferred, from what was not, it is impossible to trace the title of stock as you can that of an estate. You cannot look further, nor is it the practice even to attempt to look further than the bank books for the title of the person who proposes to transfer to you."

I take it to be sound law, that if A., who is about to sell property to B., and take his check on a bank, applies at the counter of the bank to the proper officer, who informs him that B. has the funds in deposit, and his check will be good, the bank will not be permitted to deny the truth of the assertion after A. has acted upon it, on the ground that its officer had no authority to keep any but correct books. But these parties stand upon a still better footing, for they have relied not merely upon a certificate issued by the agent, but upon the records of title to stock kept by the company, which were the only other existing sources of information. They have there found the stock they proposed to purchase credited to the party offering it for sale, in the stock ledger of the corporation, which is the best evidence of the existence of all genuine stock transferable at this office. Is it to be tolerated that the responsibility for the correctness of these books rests altogether upon dealers who have no control over them?

The defendants who have been led into loaning their money upon certificates and transfers, held and made by parties who had like credits on the books, and who apparently complied with every condition, stand on the same footing with those just noticed. Public policy and the true interests of all parties concerned, as well as plain principles of equity and justice, require that the corporation make good the losses they have sustained.

There is still another class whose claims arise upon other facts, and rest on different principles. It is composed of those defendants who have received certificates representing actual and genuine stock of the company, but whose certificates were rendered valueless by a subsequent transfer to *bona fide* purchasers of the same stock, by the party to whose credit it stood on the books. To this class belong a part of the certificates held by the defendant Vanderbilt; the certificates of Jacob Surget, those of Ketchum & Bement, a part of Schuchard & Gebhard's, and perhaps some others. These certificates have been held to be spurious, by which I understand the court to mean nothing more than that they became invalid as representatives of stock, after the same stock had got into the hands of other *bona fide* holders.

The case of Jacob Surget presents the question arising in this class with distinctness. On the 11th of December, 1852, he loaned to R. & G. L. Schuyler the sum of $11,000, to secure which they delivered to him a certificate for 110 shares of the capital stock of the New York and New Haven Railroad Company, issued to them with the ordinary assignment and blank power of attorney indorsed thereon and duly executed by them. On the 2d of September, 1853, Surget loaned to that firm the further sum of $9,500, on the security of 110 other shares of such stock, the certificate for which was delivered to him with the proper assignment and power of attorney executed in blank by said firm. These certificates were genuine, and represented actual stock of the company then owned by the Schuylers and standing to their credit on its books.

On the 3d of November, 1853, Surget was, and had been from September, 1850, the owner of 200 shares of the stock

of the company, for which he held its certificate. On that day he agreed with the Schuylers to sell to them this stock, and to loan them some $7,000, in security for which he was to hold 75 shares of the stock thus sold to them. He made the loan, and, to carry out the arrangement, transferred to them the 200 shares, and delivered up his certificate, and at the same time received back a certificate for seventy-five shares issued to them at that time, with the proper and duly executed power of attorney. The stock represented by these several certificates was genuine, and no question is or can be made affecting the propriety or authority of the act of the officer in issuing the certificates.

Surget did not transfer the stock on the books, but retained the certificates in his possession, and his loans to the Schuylers remain for the most part unpaid. Afterwards, Schuyler & Co. transferred on the books all their stock to other parties, who were purchasers in good faith, and the outstanding certificates held by Surget were not surrendered nor accounted for.

In November, 1854, Surget presented his certificates at the transfer office of the company and offered to surrender them, and requested permission to transfer the stock represented by them; but the company refused to receive the surrender or permit the transfer, on the allegation that the certificates did not represent genuine stock.

The plaintiffs have demanded and obtained a judgment declaring the certificates held by Surget to be void, and directing their cancellation. By his answer, Surget insisted that his stock was, and should be declared to be, genuine, or that he should be awarded damages for the refusal of the company to recognize it as such.

The principal questions that present themselves in this case are:

*First.* Whether the subsequent purchasers in good faith of the stock acquired by the transfers on the books of the company a title superior to Surget's, under the certificates held by him; and,

*Second.* If they did, whether the company are liable to him for permitting the transfers to be made without the production and surrender of the outstanding certificates.

The law, as settled by authority, touching the first of these questions, is this: Where the stock of a corporation is by the terms of its charter or by-laws transferable only on its books, the purchaser who receives a certificate with power of attorney gets the entire title, legal and equitable, as between himself and his seller, with all the rights the latter possessed; but as between himself and the corporation, he acquires only an equitable title which they are bound to recognize and permit to be ripened into a legal title, when he presents himself, before any effective transfer on the books has been made, to do the acts required by the charter or by-laws in order to make a transfer. Until those acts be done he is not a stockholder and has no claim to act as such; but possesses, as between himself and the corporation, by virtue of the certificate and power, the right to make himself, or whomsoever he chooses, a stockholder, by the prescribed transfer. The stock not having passed by the delivery of the certificate and power of attorney, the legal title remains in the seller, so far as affects the company and subsequent *bona fide* purchasers who take by transfer duly made on the books. And hence a buyer in good faith, of the person in whose name the stock stands on the books, who takes a transfer in conformity to the charter or by-laws, permitted to be made by the authorized officer of the corporation, becomes vested with a complete title to the stock, and cuts off all the rights and equities of the holder of the certificate to the *stock itself*. What other rights and equities he may possess is another question; but if the transferee has taken in good faith and for value, the stock is gone beyond his reach and beyond recall by the corporation. (*Stebbins* v. *Phenix Fire Ins. Co.*, 3 Paige, 350; *Union Bank* v. *Laird*, 2 Wheat., 390; Angel & Ames on Corp., 352, 353, 3d ed.; *Mechanics' Bank* v. *New York and New Haven R. R. Co.*, 3 Kern., 621, *et seq.*, per Comstock, J.; *Bank of Utica* v. *Smalley*, 2 Cow., 770; *Gilbert* v. *Manchester Iron Co.*, 11 Wend., 627; *Borgate* v. *Shortridge*, 31 Eng. L. and Eq., 58; *Wilson* v. *Little*, 2 Comst., 447, per Ruggles, J.)

The non-production and surrender of the certificate at the

time of the transfer, is not fatal to the title of the transferee. It is only essential to the safety of the corporation, and may be waived by it at its own peril. The company has the means of knowing whether a certificate of particular stock is outstanding or not, and *the power to compel its return and cancellation* before any transfer is made, and a buyer, where the transfer is permitted by the corporation to be made on its books, by one to whose credit the stock is standing, has a right to presume that no certificate has issued, or if one has, that his vendor has duly surrendered it for cancellation.

It follows, therefore, that the stock represented by the certificates in Surget's hands, passed to the subsequent *bona fide* transferees; and the company had neither the power nor right to permit it to be transferred to Surget on his subsequent demand. In my judgment, no action would lie against them for that refusal. It was, in effect, asking them to do what the law prohibited them from doing — to duplicate the shares represented by the certificates, with a knowledge that they had long before passed into other hands, where they were still in actual and potential existence. The rights of Surget, if he have any, must stand on other grounds than the refusal in November, 1854, to permit him to transfer stock which then legally belonged to others.

The second question is, whether the company are liable for permitting the transfers to be made, without the production and cancellation of the outstanding certificates, whereby Surget's equitable rights to the stock were cut off and lost. The question is first to be considered on the assumption that the company permitted the transfer. It has been seen that Surget's rights as between himself and the corporation were those of an equitable, and not legal owner of the stock. It may be stated as a clear proposition, that where notice of the rights of an equitable owner are brought home to a party to be affected by such rights, the remedies for a subsequent injury to those rights is complete and perfect; and so it cannot be doubted, that if Surget had given the company actual and plain notice that he was the holder and owner of the certificates in his hands, the permitting of a subsequent trans-

fer to another, under circumstances that caused the title of the stock to be lost to him, would have subjected the corporation to respond to him for the injury. But the company had not actual notice; and hence it is essential in this view of the question, to show that its relations to the holder of the certificates were equivalent to those of a party with notice. By its charter the corporation was authorized to make by-laws to regulate the transfer of its stock. It had done this by the adoption of by-laws, which, as we have seen, *ex proprio vigore*, prevented the legal title of stock from passing otherwise than by the prescribed mode of transfer; and as a part of these by-laws it had provided for the issuing of certificates to stockholders, in a form to be "appointed and directed" by the directors; had authorized transfers by power of attorney, and had expressly declared that *when a certificate of stock had been issued to a stockholder, no transfer of the stock should thereafter be permitted without the surrender of said certificate.* The board of directors had also prescribed a form of certificate which was thereafter invariably used, which declared that the stockholder was entitled to the number of shares named, and that they were transferable on the books of the company at the office named, "*on the surrender of this certificate.*" They prepared and caused to be printed on the back of this form of certificate, an assignment thereof, with a power of attorney to be executed in blank by the stockholder, for the purpose of facility of transfer. That this was a customary and long established mode of making stock readily and profitably marketable, was well known to the company, for its by-laws speak of it as "the usual form." Now while the corporation could not give to a certificate of this kind, *negotiability* in its legal commercial sense, it could and did approximate to that characteristic, as nearly as legally possible for the purpose of making its stock more valuable by the ease with which its certificates could pass from hand to hand by simple delivery. It was never intended to lock up those instruments in the hands of the stockholders named in them—but to give to them every practicable facility as the basis of commercial transactions. And

this was legitimate and proper, since it tended to enhance the value of the corporate franchise, by making its stock a subject of easy investment and ready convertibility.   But it was essential to make these certificates in a form to secure public confidence, and this could only be done by making them *solemn assurances of rights.*   Hence by its by-laws the corporation declared that the stock represented by them should never be transferred, except upon the delivery and cancellation of the certificate; and this provision, in effect, it embodied in the certificate itself.   Armed with such instruments, it sent its stockholders into the commercial world, with knowledge of the established usage of dealing on the faith of such certificates; and it addressed them, not to the stockholder himself, who had no need of the notice, but to all men who should desire to participate in the advantages or profits of its franchise.   It was to all such persons that it assured safety in purchasing the certificate, by declaring that the stock should only be transferred upon its surrender and cancellation.   In this manner it courted and established privity between itself and every holder of the certificate, by asserting that his equitable title was safe, because nobody but he could transfer the legal title.   It should be constantly borne in mind, that the certificate now spoken of is a valid one, representing actual stock; and upon the transfer of such an one, a privity at once springs up upon the title he acquires from his vendor, and his equities as against the corporation, through which every assurance of the instrument is addressed to him; and it is upon this principle that *Kortright* v. *Buffalo Commercial Bank* (22 Wend.), properly stands.   When, therefore, the original stockholder to whom such a certificate has been issued, comes to the corporation to transfer the stock, its books are notice to it that the certificate has been issued.   The by-laws and the certificate are notice that it must be surrendered before the stock can be transferred, and its non-production is notice that it is not in possession of the party claiming to transfer.   These facts operate as notice that some other party is its owner; and they put the corporation upon the inquiry that would lead

ordinary sagacity to the truth; and this is equivalent in equity to actual notice of all the rights that inquiry might develope.

Again, the transfer agent had actual notice of the previous transfer of the certificates to the defendant, for he made the assignment to him. The effect of this fact was very fully discussed by the Supreme Court of Connecticut in *The Bridgeport Bank* v. *The N. Y. and N. H. R. R. Co.* (30 Conn., 270). "Now their transfer agent knew" (said the court in that case), "when he allowed these transfers to other parties, that the stock had already been sold to a prior purchaser who held a legal certificate for it, and that it was a fraud on that party to allow the stock to be transferred to other parties so long as the certificate was not surrendered. The transfer agent, on allowing these transfers, was acting precisely within the scope of his official power, and his knowledge and fraud are therefore the knowledge and fraud of the defendants themselves." * * * * "The plaintiffs, it is said, should have given notice of their equitable title. But how should they have given such notice? Why, only to that officer of the company whose duties related to the transfer of their stock; that is to their transfer agent, Robert Schuyler himself. But Robert Schuyler already had full knowledge of the fact, for he was the very party who sold the stock to the plaintiffs; and though a distinction may be made between the knowledge which he had as an individual, in which capacity he was acting, in selling the stock, and the official knowledge which he would have acquired by a formal notice given to him as transfer agent of the company. Yet practically this distinction is very unimportant. * * Notice of such an equitable title is never required to be formally given. Actual knowledge, however acquired, is enough to affect an individual, and we entertain no doubt that this knowledge of Robert Schuyler is to be regarded as the knowledge of the defendants. It to be observed, too, that Robert Schuyler was not merely the transfer agent of the defendants, but was at the same time the president of the company, and one of its directors." If this reasoning be

sound, the corporation in this case must be held chargeable with actual notice of Surget's equitable rights.  Hence, in either view of this question of notice, on the assumption that the corporation consented to the transfer of the stock for which Surget held the certificates and power of attorney, it is chargeable with notice of his rights, and liable to respond for the injury its disregard of them has produced.

In *Pollock* v. *The National Bank* (3 Seld., 274), it was held that where a bank had permitted the transfer of stock under a forged power of attorney, and canceled the original and issued a new certificate, the bank was liable to the real owner to replace his stock or pay him the value thereof.  In that case there was undoubted good faith in the bank, the officers of which had been deceived by a forgery into doing the act which had produced the injury.  In this case the assent could not have been in good faith, for it was in violation of an inherent law of the company's stock regulations, and no milder rule of liability could flow from it.  (*Davis* v. *Bank of England*, 2 Bing., 393; *Asby* v. *Blackwell*, 2 Eden Ch., 299.)

But there is another and well settled principle upon which a corporation that permits a transfer of stock under such circumstances should be held liable.  It is this, that " all duties imposed upon a corporation by law raise an implied promise of performance." (Per Nelson, J., *Kortright* v. *Buffalo Commercial Bank*, 20 Wend., 91–94.)  It was upon this principle that assumpsit was maintained in the case just referred to, and that Lord Mansfield denied a mandamus in *The King* v. *The Bank of England* (Doug., 523), to compel the bank to enter a transfer of stock on its books, on the ground that an action would lie for a complete satisfaction equivalent to specific relief.  " The law supposes that the corporation promises or undertakes to do its duty, and subjects it to answer in a proper action for its defaults, whether of nonfeasance or misfeasance. (3 Dane, 109 ; 5 id., 160.)

In *Bank of Columbia* v. *Patterson* (7 Cranch, 299, pp. 305, 306), Mr. Justice Story, in an able, learned and concise statement of the powers, duties and liabilities of corporations,

observed, that "all duties imposed on them by law, and all benefits conferred at their request, raise implied promises for the enforcement of which an action may well lie." (Per Putnam, J., in *Sargeant* v. *Franklin Ins. Co.*, 8 Pick., 98.)

The action of assumpsit was brought in *Kortright* v. *The Buffalo Commercial Bank*, for a refusal to permit a party holding a certificate and power of attorney to transfer the stock on the books of the bank. It was held, for the purpose of sustaining that form of action, that the law imposed the duty to permit the transfer, and raised an implied promise in favor of the party holding the certificate that that duty should be performed. In this case it was a duty enjoined upon the corporation by its by-laws not to permit a transfer of the stock without the surrender and cancellation of the certificate which it had issued. That duty raises a promise in favor of the holder of the certificate that it shall not be done. On the face of the certificate is a notice to all parties that the instrument must be surrendered upon making a transfer, and I think it would be straining no principle of law to say, that the contents of the certificate are an assurance amounting to a promise that this rule shall be adhered to for the benefit of the equitable owner of the stock. The court went much farther in the *Bridgeport Bank case*, above referred to, and held that "The *bona fide* holders of such certificates had a right to rely on the certificates under the circumstances as securing to them the stock which they represented against all transfers to other parties." (30 Conn., 270.)

If the corporation, therefore, permitted the transfer of the stock, of which Surget was the equitable owner, in violation of its undertaking to protect his rights, the law gives him a remedy to the extent of the injury, upon the implied promise to do no such act to his prejudice.

But it is claimed, as an answer to this alleged liability, that the transfer was made or permitted by an agent of the company, who acted in excess of his powers. Clearly it was the duty of the transfer agent to have required the surrender and cancellation of the outstanding certificates. That was one of the very duties he was put there to perform. He

failed to do it, to the injury of Surget; and it is the very
ground of the company's liability, that its agent failed to do
the duty enjoined upon him. The parties were dealing all·
the while in the actual and legitimate stock of the company,
and the agent was called upon to do an act within the exact
scope of his authority. An engineer is strictly prohibited to
cross a draw bridge without seeing that signals of safety are
given. He drives heedlessly on when no signals are given.
This is a plain breach of duty and excess of power, but on
that exact ground the corporation are liable to every party
·injured. So here the agent disobeyed the rule and made the
transfer; but he made it effectual to the injury of Surget.
Who shall suffer, the innocent holder of the certificates, or
the employer of the faithless servant whose breach of duty
has caused the loss? In *Pollock* v. *National Bank* (*ubi sup.*),
the officer who permitted the transfer clearly had no authority
to do so on a forged power of attorney. But the bank was
held chargeable with the consequences of his act, when it
refused to recognize the plaintiffs as the owners of the stock.
Certainly this must have been on the principle that the bank
was chargeable with its officers' negligence in permitting the
transfer on the forged power. "For where a trust," says
Lord Holt (12 Mod., 472, 490), "is put in one person, and
another, whose interest is intrusted to him, is damnified by
the neglect of such as that person employs in the discharge
of that trust, he shall answer for it to the party damnified."
Nor does it matter that the agent fraudulently neglected his
duty for his own private gain; for then arises the exact case
for the application of Lord Holt's rule, that when one of two
innocent persons must suffer from the fraud or misconduct of
a third, he who has reposed a trust or confidence in the fraud-
ulent agent ought to bear the loss.

But there is another answer to this position. The plain-
tiffs insist, and have procured the court to adjudge, that the
transfer permitted or made by their officers has cut off Sur-
get's equitable title to the stock, and on that ground to declare
his certificates to be nullities. For this purpose, and to this
extent, they ratify the act of the agent and the record of

transfer; but the corporation must take the act with all its consequences or reject it utterly. They cannot affirm in part, and disaffirm as to the residue. (*Bennett* v. *Judson*, 21 N. Y., 238; Story Agency, § 250; Hovenden on Fraud, 144, 145; 2 Denio, 261.) And so, when the plaintiff seeks to annul valid certificates of stock on the ground that an effective transfer of the title to a *bona fide* purchase had been made on their books, they affirm the validity of that transfer as to all of its consequences, and are not to be heard to say that the agent who permitted it gave it validity so far as it injured the holder of a genuine certificate, but no effect in so far as it would have given a remedy for the injury. On these grounds, it seems to me, the plaintiffs were clearly liable to Surget; and the court very properly may apply the rule, that he who seeks equity must do equity. It is through a particular and gross wrong of their agent that the plaintiffs' equity is sought, and the same wrong entitles the defendant to relief.

It is objected that an improper measure of damages was adopted upon the assessment in Surget's case. Evidence was given of the amount of the loans remaining unpaid. No objection was made to this evidence. The amount was nearly equal to the par value of the stock. It is clear that his measure of damages was the amount of his loans, if they did not exceed the value of the stock at the time of the transfer, for that is the date of his injury. The referee did not find this exact date, but the proofs show that it must have occurred when the stock was at or above par. The only exception is a general one to the judgment in his favor, that is, *to any judgment*, and does not reach the question as to the rule of damages.

It follows from these views that the judgment in favor of Jacob Surget should be affirmed with costs, and the order dismissing his appeal be reversed, and the appeal heard under the stipulations, and the judgment on his appeal affirmed with costs against him.

The case of the defendants Morris Ketchum and Edward Bement, survivors, &c., upon the merits, presents substan-

tially the same question as that of Jacob Surget. The certificates upon which they claim are adjudged to be spurious and void. They were issued on the 1st of July, 1854; but it appears that they were made upon the surrender and cancellation of several other certificates long previously issued to R. & G. L. Schuyler, and by them assigned with the power of attorney duly executed in blank. The court has found that these last named certificates, when issued, were genuine, and represented actual stock of the corporation standing to the credit of the Schuylers on its books; and that afterward, and before the transfer and issuing of the new certificates of July 1st, the stock represented by those certificates was transferred on the books by the Schuylers to *bona fide* purchasers.

If the views suggested in Surget's case be sound, the certificates of July 1st, 1854, were properly set aside and ordered to be canceled by the court, for the stock represented or called for by them had become the property of other and innocent parties. But this fact did not affect the right of these defendants to insist upon compensation for the injury sustained by permitting the transfer without the surrender of the certificates in their possession. They were entitled to recover on the same grounds indicated in Surget's case, and should have been awarded their damages.

But it seems that the court below denied all remedy to this firm (consisting of Ketchum, Rogers & Bement), on the ground that Ketchum, one of the firm, was a director of the corporation during the entire period of the frauds committed by the transfer agent, and was therefore in some sense chargeable with the consequences, because of the neglect of the board of directors. No actual fraud — no participation in the acts of Schuyler — and no personal knowledge on the part of Ketchum is found, but, on the contrary, it is expressly found that there was no evidence of any actual knowledge by any of the directors, except Schuyler, of any of his fraudulent acts in the performance of his duties as transfer agent; and there is no proof whatever in the case connecting Ketchum with any of these transactions, beyond the simple fact that he was one of the directors. Indeed no issue seems

to have been made either in the pleadings or on the trial, on this question, so far as it particularly affects the defendant Ketchum, and therefore no opportunity was given for explanation or proof in exculpation of his real or imaginary connection with these frauds. But upon what principle *his firm* are deprived of their legal rights by his omission of duty as a director of the company is not apparent. Perhaps as an individual there would be no lack of equity in holding him to this rigid measure of justice; but why his neglect of duty should bring so heavy a penalty upon the firm of which he happens to be a member, has not been satisfactorily shown. Besides, the frauds of Schuyler, for which the directors are found to be censurable for neglect, are in the transferring of spurious stock and the issuing of false certificates therefor. The wrong for which these defendants have a claim upon the company is for the transfer of genuine stock to a *bona fide* purchaser without requiring the surrender of their outstanding certificates. No necessary connection exists between these acts, and upon none of the facts found is any to be perceived. The company owed the same duty to his firm in respect to the protection of its equitable title to stock as to any other holder of a valid certificate; and the wrong consists in the neglect of the officer it appointed to discharge that particular duty. A railroad corporation would be liable for injuries sustained through the neglect of its employees, by a director (*not riding on a free pass*), notwithstanding the neglect is, legally speaking, that of the company, whose powers are exercised through the board of which he is a member. They would certainly be so for the property of his firm which they were transporting, and it seems to me it should be no defense to show that the board of directors had appointed a careless superintendent who had sent out an unfit engine and thereby occasioned the injury.

In my opinion, it was error to refuse relief to this firm on the grounds above indicated.

A question of jurisdiction was presented on the appeal of these parties and plausibly argued; but I conceive there can be no doubt of the jurisdiction of the court of this State to

entertain a suit brought by a foreign corporation against parties residing in this State, to cancel fraudulent certificates of its stock, or set aside fictitious transfers that may be used to its prejudice and the injury of the community; and especially to prevent innumerable litigations in the courts of this State in actions sounding in damages for alleged injuries to the rights of such parties as stockholders.

If the appeal of Ketchum and Bement was properly taken, and ought not to have been dismissed by the court below, then the judgment as to them should be reversed and a new trial ordered, with costs to abide the event.

So far as the claim of Vanderbilt grows out of the certificates which were genuine when issued, but have become invalid by reason of the subsequent transfers, it stands on the same grounds as Surget's; and for the same reasons, the judgment in plaintiffs' favor on his appeal should be affirmed with costs.

The judgments against the plaintiffs, I think, ought to be affirmed on the general grounds above discussed; and the judgment in favor of plaintiffs affirmed, except as to Ketchum and Bement, in whose favor there should be a reversal, and a new trial ordered, with costs to abide event.

Denio, Ch. J., Wright, Potter, and Brown, JJ., concurred with Davis, J.

Judgment affirmed.