THE CITY NATIONAL BANK OF DALLAS, RESPONDENT, v. THE NATIONAL PARK BANK OF NEW YORK, APPELLANT.

*Bank — when it is chargeable with the knowledge of its president — when it is liable for his fraudulent acts — right of a party defrauded, to waive the tort and proceed, or interpose a counter-claim based upon an implied contract, against one of several wrong-doers.*

In this action, brought by one bank against another to recover the balance of a deposit due to the plaintiff, the defendant, while admitting the receipt of the moneys, set up as a counter-claim a demand against the plaintiff for money alleged to have been fraudulently procured by its president from the defendant. The claim was that one Hardie, the president of the plaintiff, was enabled by the negligence of its board of directors to take entire charge of its business; to grossly mismanage its affairs, and to borrow for his own purposes large sums of money from it upon insufficient and worthless securities, he being at the time insolvent; that thereafter Hardie, with the knowledge of the plaintiff's vice-

president, who knew all the facts of the case, went to New York to try and borrow money, taking with him certain of the worthless securities; that he fraudulently borrowed upon them from the defendant in New York, a large sum of money, a part of which was applied to the discharge of a portion of the indebtedness due from Hardie to the plaintiff.

*Held,* that if the jury should find that the money was fraudulently procured from the defendant by Hardie, the defendant was entitled to retain from the amount due to the plaintiff an amount equal to the sum which had been so received, as aforesaid, by the plaintiff from Hardie.

The defendant also claimed to charge the plaintiff with all the money fraudulently obtained from it by Hardie, as well that obtained upon his individual account as that applied by him to the discharge of his indebtedness to the plaintiff, upon the ground of a joint conspiracy to defraud on the part of the plaintiff and Hardie, and sought to recover the said amount in this action as a counter-claim.

*Held,* that the defendant had the right to waive the tort, and proceed upon the implied contract to repay the money obtained by the fraud.

That as the bank and Hardie were jointly and severally liable for the tort so waived, their liability upon the implied contract was of the same character.

That the defendant might set up its claim upon the said implied contract as a counter-claim in this action against it, although Hardie was not a party thereto.

APPEAL by the defendant from a judgment, entered upon the verdict of a jury, and from an order denying a motion for a new trial made upon the minutes of the justice before whom the action was tried.

The action is brought to recover the balance due upon a deposit made by the plaintiff with the defendant. The answer admits all the allegations of the complaint, and sets up by way of counter-claim that in September, 1880, A. F. Hardie was president of the plaintiff's bank; that in that month the plaintiff's officers first discovered that Hardie was indebted to it in about $30,000, which he was unable to pay, and for which he had imposed on the plaintiff worthless collaterals; that the officers and managers of the plaintiff took away from Hardie the management of the bank and kept him as a figure-head merely until he should succeed in raising money enough to pay his debt to the plaintiff, and that the plaintiff, by its officers and agents, conspired with Hardie that he should set forth and obtain from whomsoever he could persuade to lend him, upon worthless collaterals, money enough to pay this indebtedness; that in pursuance of this conspiracy Hardie came to New York, and in September, October and November, 1880, fraudulently

borrowed of the defendant $29,661 upon the faith of worthless collaterals; that at this time Hardie was insolvent, and that he borrowed the money with the preconceived intention not to pay for it; that the plaintiff retained Hardie in his office as president for the purpose of giving him credit until he had borrowed this money and then dismissed him, and for the same purpose permitted him to transfer the plaintiff's account in New York to the defendant from another bank; that of the money thus obtained by Hardie the plaintiff and Hardie applied $13,000 to pay a part of Hardie's indebtedness to it, or obligations of others upon which Hardie was liable; $9,338.33 being so applied October 4, 1880, and $1,000 October 27, 1880, and the rest of the $13,000 at various dates between October 1 and December 1, 1880; that the balance of the money the defendant paid directly to Hardie, or to others at his request. The answer then demands judgment against the plaintiff for $25,661 and interest.

*Francis C. Barlow*, for the appellant.

*Moore, Low & Sanford*, for the respondent.

Davis, P. J.:

One important question presented by this appeal is to what extent the plaintiff is chargeable with notice or knowledge of the fraudulent manner in which Hardie, while its president, obtained the money of the defendant, which he afterwards paid to the plaintiff in discharge of his individual liabilities. The court submitted to the jury the question of actual notice or knowledge, instructing them that the defendant was entitled to recover, as a counter-claim, the amount so paid, if they found that at the time of such payment the plaintiff knew that Hardie had obtained the money by fraud. The court refused to charge that the plaintiff was chargeable with constructive notice because of Hardie's relation to it as president at the time of committing the fraud, and of making and indorsing the check given to the plaintiff whereby the money was received by the bank and applied to his liabilities. In considering this question it is to be assumed that Hardie while president of the plaintiff's bank committed the alleged frauds upon the defendant bank, and thereby obtained the discounts and credits against

which he drew his checks in favor of plaintiff. Hardie had been president of the plaintiff from its organization and the commencement of its business on the 1st day of March, 1880. J. C. O'Connor was its vice-president. It had a board of directors consisting of Hardie, O'Connor, and five others, and it had no regular cashier till October, 1880. At times Hardie performed the duties of both president and cashier. The vice-president was absent in Europe from the spring till August, 1880. Prior to that time Hardie had almost entire charge of the business of the bank. After O'Connor's return he had charge of the business of the bank in the absence of Hardie, but Hardie continued to be the president of the bank till December 16, 1880.

It is manifest, from the statement of the bank's affairs, that Hardie not only had charge of its business but was suffered by a supine and negligent board of directors to manage it almost wholly for his own business and purposes till he had loaded it down with his own liabilities, as principal or surety, in a sum between $70,000 and $80,000, and that the collateral securities he had put in for his indebtedness were perilous, if not largely valueless. When the vice-president returned he assumed in part the management of the bank. In August the condition of the bank and the indebtedness of Hardie were fully discussed between those officers, and the vice-president, in September, told the president that he would not be able to meet his indebtedness to the bank. The vice-president then knew Hardie was going to New York to try to borrow money. Hardie was then wholly insolvent, as is manifest not only by subsequent disclosures, but as testified to by Mahoney, who became in October, the cashier of the bank. Hardie came to New York in September, bringing with him the paper or securities on which he was to make his effort to borrow money. O'Connor knew what those papers were, except the Lee notes obtained by exchange after Hardie left Dallas. It was obviously the understanding that the money he could borrow, in part, if not wholly, was to be applied to relieve his indebtedness to the plaintiff. No restriction whatever was put upon his power as president. He borrowed of Claflin & Co., on a part of the notes which he had taken up at plaintiff's bank and brought from Dallas, some $15,000, with $10,000 of which he, acting as president of plaintiff's bank, opened an account with defendant for plaintiff, and

left his own and O'Connor's signature. Of this action O'Connor was immediately notified by telegram, and at once wrote defendant, ratifying it, and stating what officers were entitled to draw against the account, to wit: A. F. Hardie, president, himself as vice-president, and Paul Furst, acting cashier.

At the same time Hardie obtained the fraudulent discounts for which the defendants seek to counter-claim against the plaintiff. Immediately on his return home, Hardie, as president of plaintiff, corresponded with defendant, remitting bills or notes for discounts, both for the bank and himself. He was not deprived of his position or power as president till a fraud on the plaintiff in indorsing his private paper in the name of the bank, and obtaining its discount for himself at St. Louis, awoke the board of directors to a sense of their duty.

It is upon such a state of facts, all of which a jury could have found from the evidence, that the question arises whether the plaintiff, in receiving the fruits of its president's fraud on the defendant, is not chargeable with notice of his acts. That question is not to be considered as one arising upon the action of the president of a bank who had in its business performed the simple functions of that office, under the control and supervision of the board of directors which the banking law requires to be created and upon which it devolves the duties prescribed by law. It is, on the contrary, to be considered in a case where the board has negligently suffered the president not only to usurp its own functions, but to use them to his personal advantage, in a manner and to an extent which violated the law and subjected all the parties to its penal consequences. In short the president had been permitted to become and be the bank, as representing all its corporate functions, and both figuratively and in fact to be its eyes and ears and all the several senses that can in law or theory pertain to corporate existence. When such a president starts out for a raid upon the financial credulity of other banks and capitalists for the purpose of capturing funds with which to relieve himself and his bank from the embarrassments in which he has plunged it, there is no lack of reason or law in holding that his knowledge of any fraud he commits in obtaining the money shall be charged as notice to his bank when it becomes the recipient of the plunder. The mere abstract question whether the knowledge of the president of a bank of his

private personal dealings, when through them he brings a benefit to the bank, is notice to it of all that he himself knows on the subject of his acts, seems to us not controlling of such a case as this.

As was held in the Schuyler case (*N. Y. and N. H. R. Y. Co.* v. *Schuyler*, 34 N. Y., 30), when directors abdicate their powers in favor of a president to an extent that virtually makes him the sole representative of the corporate body, the corporation shall not be heard to deny that he is such body, when through his wrongs they seek to derive an advantage to the corporation from any fraudulent or excessive act. If the corporation would be chargeable, had it done the act or possessed knowledge of it, they should be charged with the knowledge their president possesses. On this ground the court should have charged the jury that the defendants, if the fraud was found to have been committed by the president of plaintiff, was entitled to protection to the extent of the fruits which reached the hands of the plaintiff.

These views, we think, are fully justified by *The Fulton Bank* v. *The Canal Company* (4 Paige, 127); *The Bank of the United States* v. *Davis* (2 Hill, 451); *Holden* v. *New York and Erie Bank* (72 N. Y., 286); *Atlantic Bank* v. *Merchants' Bank* (10 Gray, 532); *New York and New Haven Railroad Company* v. *Schuyler* (34 N. Y., 30). Some of these cases go far enough to hold that the knowledge of a president who has exercised only the ordinary powers of that office is the knowledge of his bank, or notice to it when he acts officially in receiving any advantage to the bank flowing from his individual acts. Especially may this be so when the individual action is taken wholly or in part for the purpose of benefiting the bank, by procuring means with which to pay liabilities owing to or held by it against himself or another.

The other grave question of the case, to wit, the right to counter-claim in this action on the ground of joint conspiracy to defraud on the part of plaintiff and its president, was disposed of by the court by holding that damages for such a conspiracy, if established, could not be interposed as a counter-claim in this suit.

The defendant alleged that the plaintiff and Hardie conspired to defraud the defendant, and by means of such conspiracy Hardie obtained a large sum of money beyond that which is shown to have been paid by him to plaintiff, and sufficient facts are averred to

maintain, if proved, an action of tort for fraud against the plaintiff and Hardie. Either of the conspirators would be liable to such an action for the damages sustained by the fraud. The defendant sought to waive the tort and proceed upon the implied contract to repay the money obtained by the fraud. This clearly could be done. (*Harway* v. *The Mayor*, 1 Hun, 628; *Wood* v. *The Mayor*, 73 N. Y., 556; *Coleman* v. *The People*, 58 id., 555; *Andrews* v. *Artisans' Bank*, 26 id., 298.)

But it is insisted, in substance, that such an action on the implied promise would be on a joint and not several contract, and that for that reason, inasmuch as Hardie is not a party to the action as plaintiff or otherwise, the implied contract cannot be set up in this suit as a counter-claim. We think the implied contract in such case which arises upon waiver of an action for tort is joint and several and not joint alone. Such was the nature of the tort and each party could have been separately sued upon it, and the same reason extends to the implied contract. Either conspirator may be sued upon his implied promise, and be made to answer for the whole of the money obtained by the fraud consummated under the conspiracy. If this be so, when either conspirator brings an action against the injured party upon contract we see no sound reason why his liability on an implied contract to pay the defendant the moneys fraudulently obtained may not be asserted against him as a counter-claim. It was error, therefore, to take the question of the defendant's counter-claim away from the jury, assuming that there was evidence sufficient to carry it to the jury, as we must, inasmuch as it was not withheld on any such ground.

The judgment should be reversed and a new trial granted, with costs to abide the event.

BRADY and DANIELS, JJ., concurred.

Judgment reversed, new trial ordered, costs to abide event.